THE CONNECTICUT COMPANY *v.* DIVISION 425, ET AL.,
OF THE AMALGAMATED ASSOCIATION OF STREET,
ELECTRIC RAILWAY AND MOTOR COACH
EMPLOYEES OF AMERICA ET AL.

BALDWIN, C. J., KING, MELLITZ, SHEA and DEVLIN, Js.

Argued June 28—decided July 29, 1960

*Norman Zolot,* for the appellants (defendants).

*John L. Collins,* with whom, on the brief, was *Thomas J. O'Sullivan,* for the appellee (plaintiff).

BALDWIN, C. J.   The plaintiff, the Connecticut Company, brought this action in the Superior Court

by writ dated May 12, 1959, against local unions of its employees. These unions are divisions of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, A.F.L.–C.I.O. The plaintiff seeks a declaratory judgment that an agreement of October 26, 1955, between it and the defendants was terminated as of September 30, 1958, and is no longer in effect. See General Statutes § 52-29; Practice Book §§ 276-280. The plaintiff also sought a temporary and a permanent injunction restraining the defendants from bringing or prosecuting any action in any court to compel the specific performance of the agreement for any period of time beyond September 30, 1958. A temporary injunction issued on June 11, 1959. On July 31, 1959, the plaintiff amended its complaint by adding a second count in which it again sought a temporary and a permanent injunction against any court action by the defendants to compel arbitration concerning any basic wage scales or working conditions under the contract. On September 28, 1959, the defendants answered and counterclaimed, seeking a declaratory judgment that the plaintiff was obligated to arbitrate the terms of a new collective bargaining agreement, an order that the plaintiff proceed to arbitration, and an order that the injunction be dissolved. On October 7, 1959, the defendants amended their answer and alleged that a controversy existed between them and the plaintiff which constituted a labor dispute under General Statutes § 31-112 (c) and that the Superior Court did not have jurisdiction to issue an injunction by reason of General Statutes § 31-113. The answer also alleged that the plaintiff had an adequate remedy at law. The trial court rendered judgment declaring that the agreement between the parties was

terminated as of September 30, 1958, and that the plaintiff was not under any obligation by virtue of that agreement to arbitrate basic wage scales and working conditions, and permanently enjoining the defendants from bringing any action to compel specific performance of the agreement. The defendants have appealed.

The plaintiff is a motorbus carrier operating, under a franchise from this state, in and between Hartford, Meriden, New Haven, Stamford, Middletown and Norwich. It serves an area with a population of approximately one million people and carries annually about fifty-five million passengers. Its gross annual revenue from operations in this state exceeds $1,000,000 annually. It operates busses for exclusive charter service outside the state, but its revenue from this source is less than $50,000 a year. The defendants represent, for the purpose of collective bargaining through a state conference board, 1100 employees of the plaintiff who are paid by the hour. The plaintiff has recognized the defendants as the sole bargaining agencies for its employees in the classifications of drivers and mechanics. During the past fifty years, the plaintiff and representatives of its employees have bargained collectively concerning wages, hours and other terms and conditions of employment, originally through a committee of the employees and, since 1939, through the defendants. Uniform contracts covering all divisions represented by the defendants have been negotiated for the employees. These contracts took the form of memoranda of agreement before 1939 and formal agreements thereafter. Each agreement dealt with basic wages and working conditions for its term and constituted the entire agreement between the parties for the employees covered. There have been twelve

such agreements from 1939 to 1958. During this period rates of pay and working conditions have been fixed five times in arbitration proceedings under an agreement.

The agreement concerned in the present litigation was made on October 26, 1955. It provided that the rates of pay and working conditions contained in an agreement dated May 3, 1950, should be continued for a period of thirty-six months beginning October 1, 1955, and ending September 30, 1958, except as modified by the agreement of October 26, 1955. The two agreements, together with a supplemental agreement which was executed on November 1, 1957, and modified the cost of living escalator clause in the 1955 agreement, constitute the last contract of the parties. Parenthetically, it is of some importance to note the composition of these documents. The agreement of May 3, 1950, contains three parts. Part one deals with rates of wages and "working conditions" for operators; part two, with rates of wages and "working conditions" for hourly rated shop and garage employees; part three, with general provisions relating to bus operators and hourly rated shop and garage employees. The agreement of October 26, 1955, similarly contains a part one, a part two and a part three, each dealing with the items covered in the corresponding part of the 1950 agreement. The sections decisive of the present controversy, §§ 92 (c) and 96, are included in part three of the 1950 agreement. Section 96, as amended, is repeated in part three of the 1955 agreement, while § 92 (c) remained in force without change during the period of the 1955 agreement. The determination of the instant case revolves around the proper interpretation of these two sections.

Section 96 provides as follows: "This Agreement

shall remain in effect until and including September 30, 1958 [in the 1950 agreement, September 30, 1951], and unless terminated by written notice given by either party to this Agreement to the other party at least sixty (60) days prior to said date, shall continue in effect from and after said date until terminated by such notice given by either party to the other." Section 92 (c) reads as follows: "Should written notice terminating either the basic wage scales, or any of these Working Conditions, or both, be given in accordance with Section 96 hereof, then any difference or differences concerning the basic wage scales or these Working Conditions, or both, as the case may be, shall be submitted to arbitration as provided in paragraph (e) of this section, unless an adjustment be made by negotiations between the parties." Subsection (e) of § 92 provides that the company will choose one arbitrator and the employees another, and, if agreement upon a third cannot be reached, he is to be chosen by alternately striking one name from a list of nine submitted by the Federal Mediation and Conciliation Service or the American Arbitration Association. Prior to the 1955 agreement, it was necessary for the parties to reach agreement upon the third arbitrator, who was to act as chairman.

On July 24, 1958, the plaintiff gave to the defendants timely notice of a resolution of its directors authorizing its director of labor relations and its general manager "to prepare a new contract for the negotiating committee of . . . [the defendant unions] for the period beginning October 1, 1958," and authorizing its proper officers to notify the unions "that the present contract dated October 26, 1955, and as amended is to be terminated and all of its provisions cancelled at midnight September 30,

1958." The notice stated that: "In accordance with these resolutions, we hereby cancel said agreement and terminate all of its provisions as of September 30, 1958. We have prepared a proposed new contract which we will submit at our first negotiation meeting." Prior to July 24, 1958, the defendants had given written notice of their desire to "change the agreement." In a letter under the date of August 5, 1958, they acknowledged receipt of a letter from the plaintiff dated July 28, 1958, setting August 25, 1958, as "the date and time to commence negotiations." In the letter of August 5, they set out, in detail, the "contract changes" which they desired to have made in part one (operators), part two (repair and maintenance employees), and part three of the existing contract. There was also included a "self-administered, trusteed, funded and actuarially sound Old-Age Retirement and Disability Plan . . . for all employees." The parties held their first meeting on August 26, 1958, to negotiate the rates of pay and working conditions in a new agreement to take effect October 1, 1958. The plaintiff presented its proposal, using the general form of the May 3, 1950, contract. The proposal omitted any provision for arbitration. The defendants submitted their proposals, which included the arbitration clause, § 92 (c), as before. Negotiations continued through September, 1958, the plaintiff insisting that the arbitration clause be omitted and the defendants, that it be included.

On September 30, 1958, the defendants requested in writing that the unresolved issues between the parties "be submitted to arbitration in accordance with section 92 of our agreement," appointed David Zimring as their arbitrator, and requested the plaintiff to appoint its arbitrator. On October 3, 1958, the

plaintiff notified the defendants that J. J. Gaherin would act as its arbitrator and that Gaherin would call Zimring. These two began negotiations in an attempt at amicable settlement, but they were unable to resolve the issues, the plaintiff insisting that the arbitration clause be eliminated in favor of mediation or some form of voluntary arbitration, and the defendants urging that arbitration be included. The parties were also at issue over the matter of a funded pension system. The plaintiff was willing to submit wages and working conditions to arbitration, but it refused to submit the matter of the arbitration clause and pensions. A majority of the defendants' conference board as well as the plaintiff proposed a new agreement on November 26, 1958. It substituted mediation or voluntary arbitration for § 92 (c) of the old contracts and eliminated the pension plan proposed by the defendants. The union membership rejected this proposed agreement. Negotiation continued to be fruitless. The defendants maintained that the contract of May 3, 1950, as adopted in the contract of October 26, 1955, had not been terminated and that the plaintiff must arbitrate all unresolved differences concerning the terms of a new contract. The plaintiff maintained that its notice terminated the life of the entire agreement and that it was under no contractual duty to arbitrate anything. The resolution of this issue hangs upon the intent expressed in §§ 92 (c) and 96 of the contract.

This litigation was precipitated by negotiations between the plaintiff and the defendants. Speaking generally, the dispute before the court may be said to be a labor dispute in that the protagonists are management and labor, respectively. But the question for decision is the interpretation of the provisions of a contract governing the relationship of the

parties. We have to determine the intent expressed by §§ 92 (c) and 96, two provisions contained in a contract made by parties in this state as to their respective rights and duties concerning an enterprise carried on, almost entirely, in this state. This is an issue for the court. *Chase Brass & Copper Co.* v. *Chase Brass & Copper Workers Union,* 139 Conn. 591, 595, 96 A.2d 209; *M. Shapiro & Son Construction Co.* v. *Battaglia,* 138 Conn. 238, 243, 83 A.2d 204. It is an issue properly cognizable in the courts of this state. *McCarroll* v. *Los Angeles County District Council of Carpenters,* 49 Cal. 2d 45, 60, 66, 315 P.2d 322, cert. denied, 355 U.S. 932, 78 S. Ct. 413, 2 L. Ed. 2d 415; *Coleman Co.* v. *International Union,* 181 Kan. 969, 977, 317 P.2d 831; *Philadelphia Marine Trade Assn.* v. *International Longshoremen's Assn.,* 382 Pa. 326, 333, 336, 115 A.2d 733, cert. denied, 350 U.S. 843, 76 S. Ct. 84, 100 L. Ed. 751; *General Building Contractors' Assn.* v. *Local No. 542,* 370 Pa. 73, 82, 87 A.2d 250; *General Electric Co.* v. *International Union,* 93 Ohio App. 139, 148, 156, 108 N.E.2d 211, appeal dismissed, 158 Ohio State 555, 110 N.E.2d 424; *Local 756 International Union* v. *Le Roi Division,* 274 Wis. 538, 540, 80 N.W.2d 285; see *Textile Workers Union* v. *Lincoln Mills,* 353 U.S. 448, 457, 77 S. Ct. 912, 1 L. Ed. 2d 972; *Assn. of Westinghouse Salaried Employees* v. *Westinghouse Electric Corporation,* 348 U.S. 437, 449, 456, 459, 75 S. Ct. 489, 99 L. Ed. 510; *Ferguson–Steere Motor Co.* v. *International Brotherhood,* 223 F.2d 842, 843.

In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish. *Amalgamated Assn.* v. *Con-*

*necticut Co.,* 142 Conn. 186, 192, 112 A.2d 501; *United Aircraft Corporation* v. *O'Connor,* 141 Conn. 530, 538, 107 A.2d 398; *Colonial Discount Co.* v. *Avon Motors, Inc.,* 137 Conn. 196, 200, 75 A.2d 507; Restatement, 1 Contracts § 235. The practical construction indicated by the conduct of the parties over a period of time is evidence of intent. *Beach* v. *Beach,* 141 Conn. 583, 591, 107 A.2d 629; *Volk* v. *Volk Mfg. Co.,* 101 Conn. 594, 601, 126 A. 847; 3 Williston, Contracts (Rev. Ed.) § 623. It cannot, however, prove an intent contrary to the plain meaning of the language used. *Dorne* v. *Williams,* 140 Conn. 193, 200, 98 A.2d 796; *Trumbull Electric Mfg. Co.* v. *John Cooke Co.,* 130 Conn. 12, 16, 31 A.2d 393; 3 Williston, loc. cit.; 3 Corbin, Contracts, p. 147. Every provision of the contract must be given effect if it can reasonably be done, because parties ordinarily do not insert meaningless provisions in their agreements. *Byram Lumber & Supply Co.* v. *Page,* 109 Conn. 256, 264, 146 A. 293; *Chase Brass & Copper Co.* v. *Chase Brass & Copper Workers Union,* 139 Conn. 591, 596, 96 A.2d 209. With these principles for guidance, we consider first the language used by the parties in §§ 92 (c) and 96 of their agreements. Section 92 in the contract of May 3, 1950, remained unchanged in the 1955 version, except as to the provisions of subsection (e) concerning the selection of a third arbitrator. Section 92 provides generally for the manner of settling differences between the parties "regarding interpretation of these Working Conditions or regarding discipline." Subsection (c) states that, "[s]hould written notice terminating either the basic wage scales, or any of these Working Conditions, or both, be given in accordance with Section 96 hereof," any differences concerning them shall be submitted to arbitration.

Section 96 is contained in full in both the 1950 and the 1955 contracts. The 1950 version states: "This Agreement shall remain in effect until and including September 30, 1951 [the 1955 version contains the date September 30, 1958], and unless terminated by written notice given by either party to this Agreement to the other party at least sixty (60) days prior to said date, shall continue in effect from and after said date until terminated by such notice given by either party to the other."

The written contract before us contains many provisions, most of them separable. Each provision is an agreement as to a particular feature of the contractual relationship. Section 96 fixes the term of the entire contract. It allows an automatic renewal of the entire contract unless written notice of termination is given. It is a necessary, indeed an essential, provision, separate and distinct from any other. It contains no statement of any cause for a termination but leaves it to the will of either party. Section 92 (c), however, gives to each party during the term of the contract the power to prevent the automatic renewal of any of its provisions relating to "the basic wage scales, or any of these Working Conditions, or both," by giving a sixty-day written notice as set up in § 96. It is significant that the contract contains in part one a basic wage scale and sixty-one paragraphs dealing with what are described as "Working Conditions" for operators, and in part two a wage scale for hourly rated and garage employees and twenty-five paragraphs of "Working Conditions." It is a clear assumption from the language used in these sections that either party could terminate the entire contract by giving the notice required in § 96, or, by proceeding under § 92 (c), prevent the automatic renewal of any of the basic

wage scales or working conditions and induce arbitration on these features while the contract continued in operation according to all its other terms. This interpretation gives to §§ 92 (c) and 96 their full effect. *Chase Brass & Copper Co.* v. *Chase Brass & Copper Workers Union,* supra; *Byram Lumber & Supply Co.* v. *Page,* supra.

The interpretation urged by the defendants is contrary to the clear intent expressed by the language used. However, they claim that a notice under §§ 92 (c) and 96 could lead only to a negotiation, and, if agreement failed, to arbitration of all issues in dispute. An interpretation such as this could result in the compulsory arbitration of an entirely new contract to cover future relations. It could also make the contract of 1955 interminable at the will of either party. The trial court heard evidence in great detail concerning the negotiations had and agreements made between the plaintiff and the representatives of its employees. The defendants argue that these negotiations and agreements show conduct of the parties supporting a practical interpretation of the contract and that this interpretation is the proper one. While the conduct of the parties cannot compel a construction contrary to an intent expressed in the plain language of a contract, we have, nevertheless, considered the conduct here.

From 1916 until 1939, the plaintiff negotiated agreements with its employees acting through a committee, and after 1939, with a state conference board composed of representatives of the defendants. The facts concerning these negotiations and agreements are for the most part unchallenged. The defendants claim that the conclusions drawn from them by the trial court were unwarranted. We have examined the finding, the exceptions to it, and all

of the exhibits which are made a part of the finding. It is unnecessary, for the purpose of this opinion, to trace, as the finding, with the aid of the exhibits, traces, the development and application of §§ 92 (c) and 96. While the predecessors of these sections in earlier contracts dealt with changes and modifications in "wage scales" and "working conditions," the contract of June, 1941, altered, in a significant way, the provisions of § 96 as it had appeared theretofore. Prior to 1941, § 96 had stated that "these basic wage scales" should remain in effect unless terminated by notice. In 1941, however, the phrase "[t]hese basic wage scales" was changed to the phrase "[t]his agreement." This change is entirely consistent with the clearly expressed intent that the parties, by giving notice under § 92 (c), could terminate the operation of the wage scales, or, by giving notice under § 96, could terminate the entire contract. Beginning in 1942 and continuing through 1952, the plaintiff and the defendants from time to time served written notices upon each other of their desires to change provisions in the contract. These changes related, for by far the most part, to wage scales and working conditions. All of the submissions to arbitration were made by separate written contracts of submission and dealt with one or more specific matters, never with the entire contract.

The trial court found that until the notice of termination of the agreement was given by the company on July 24, 1958, the notices given by both parties were notices of proposed changes in the contract in force and were not treated by the parties as notices to terminate the entire existing contract. Rather, these notices expressed a desire of one or the other that the agreement be "modified" or "changed in part" as to basic wages and working

conditions. Such notices would prevent the automatic renewal of the provisions in which the changes were sought but would not prevent the automatic renewal of the contract as to all other provisions. The defendants have assigned error in these findings. We consider them to be logical and reasonable inferences to be drawn from the conduct of the parties. When arbitration was resorted to, as it was on five different occasions, the employees, for aught that appears, stayed at work, abiding, as the company did also, by the terms of the contract which were not in question. Later, the parties incorporated the changes made as a result of arbitration or negotiation in a modified agreement.

As stated hereinbefore, the interpretation urged by the defendants would mean that any notice of termination could lead only to the arbitration of a new or modified agreement. They say that the arbitration provisions amount to an implied no-strike agreement. See *W. L. Mead, Inc.* v. *International Brotherhood,* 126 F. Sup. 466. The intent of the parties to a contract cannot be found by implication unless a contrary intention cannot be supposed or any other inference made. The implication must be a necessary one and quite as obvious from the terms of the contract as though the intent implied was expressed in fact. *First Ecclesiastical Society* v. *Besse,* 98 Conn. 616, 623, 119 A. 903; *Ives* v. *Willimantic,* 121 Conn. 408, 411, 185 A. 427; *Rabinowitz* v. *Connecticut Importing Co.,* 136 Conn. 468, 472, 72 A.2d 485. If the defendants had intended to agree that there would be no strike, the contract could have clearly so stated. Public policy favors negotiation and settlement of labor-management disputes without strikes, but it also favors a reasonable freedom of action for both sides. If the parties to this

litigation cannot themselves negotiate a new contract, our statutes require fair collective bargaining and provide the means of mediation and arbitration. General Statutes §§ 31-105(6), 31-117, 52-408—52-424.

If it was the intent of the parties that §§ 92 (c) and 96 require compulsory arbitration of the terms of a new contract, the requirement would apply with equal force to both parties. The trial court has found that the defendants' proposals for inclusion in a new contract, if granted by the company or allowed by the arbitrators, would amount to an additional expenditure of $2,750,000 in a year. The plaintiff's offer would require an additional expenditure of $440,000 over a two-year period. The plaintiff has continued, on a day-to-day basis, the wage scale and working conditions contained in its recent contract. The parties have continued negotiations in good faith. There has been no strike or lockout on this occasion, nor was there any during the previous fifty years. If arbitration is compulsory, the parties must submit their respective fates to three arbitrators, two of whom are admittedly partial because each represents one of the parties. The decision of the third would be controlling. The plaintiff claims that any interpretation of this contract which would require compulsory arbitration is unlawful under the rule of *Boston Printing Pressmen's Union* v. *Potter Press,* 141 F. Sup. 553, aff'd, 241 F.2d 787, cert. denied, 355 U.S. 817, 78 S. Ct. 21, 2 L. Ed. 2d 34; see *Local 170* v. *Genesee Circuit Judge,* 322 Mich. 332, 347, 34 N.W.2d 71. It is not necessary to discuss this claim because the contract, as we interpret it, contains no provision requiring compulsory arbitration when, as was the case here, one of the parties has exercised the power conferred by § 96

to terminate the contract. It necessarily follows that there is no need to discuss three cases which the defendants claim completely reject the concepts of the *Potter Press* case, supra: *United Steelworkers* v. *American Mfg. Co.,* 363 U.S. 564, 80 S. Ct. 1343, 1363, 4 L. Ed. 2d 1403, 1432; *United Steelworkers* v. *Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S. Ct. 1347, 1363, 4 L. Ed. 2d 1409, 1432; *United Steelworkers* v. *Enterprise Wheel & Car Corporation,* 363 U.S. 593, 80 S. Ct. 1358, 1363, 4 L. Ed. 2d 1424, 1432.

The clause (§ 96) providing for the continuance of the life of the contract, unless notice of termination is given, is a common one in labor-management agreements. See *United Electrical Radio & Machine Workers* v. *Union Mfg. Co.,* 145 Conn. 285, 286, 289, 141 A.2d 479. The terms of the notice given by the plaintiff brought the contractual relationship of the parties to an end. It is true that it envisaged a continuation of labor-management relationships, but under an entirely new contract which was thereafter to be negotiated. *Paterson Parchment Paper Co.* v. *International Brotherhood,* 191 F.2d 252, 254, cert. denied, 342 U.S. 933, 72 S. Ct. 376, 96 L. Ed. 694, rehearing denied, 342 U.S. 956, 72 S. Ct. 625, 96 L. Ed. 710; *Flores* v. *Barman,* 130 Cal. App. 2d 282, 289, 279 P.2d 81; *Local 756* v. *Le Roi Division,* 274 Wis. 538, 544, 80 N.W.2d 285; note, 17 A.L.R.2d 754, 758. The notice of July 24, 1958, in plain terms severed all contractual relationships. We conclude that §§ 92 (c) and 96 were separate and distinct clauses of the contract and that the notice given by the plaintiff on July 24, 1958, terminated the contract between the parties so that the provisions of § 92 (c) became inoperative.

One further claim made by the defendants con-

cerning §§ 92 (c) and 96 requires brief discussion. They rely on *International Brotherhood* v. *Trudon & Platt Motor Lines, Inc.*, 146 Conn. 17, 20, 147 A.2d 484, and *Batter Building Materials Co.* v. *Kirschner*, 142 Conn. 1, 10, 110 A.2d 464, in support of their proposition that a duty to arbitrate survives the life of the contract. These cases involve disputes which arose during the term of the contract. The dispute here arose out of provisions of the contract, but we have interpreted those provisions as not being applicable to the arbitration of issues arising out of the negotiation of an entirely new contract after notice of termination is given by one of the parties to the other under § 96. Therefore, the defendants' claim is without merit.

The defendants claim that the court had no jurisdiction to issue a permanent injunction to restrain them from proceeding with an action to compel arbitration. They allege that there is a controversy between the parties which constitutes a "labor dispute" under General Statutes § 31-112 (c). The case at bar was begun by writ, summons and complaint dated May 12, 1959. The defendants also brought an action against the plaintiff in the Superior Court to compel arbitration, but the trial court has permanently enjoined the prosecution of that action. In the action brought by the defendants as well as in the present action, the interpretation of §§ 92 (c) and 96 would have been in issue. A resolution of that issue is necessary to a disposition of either case. The pleadings in the instant case raise the issue, it has been fully tried, and the declaratory judgment of the trial court disposed of it. It is inconceivable that the plaintiff or the defendants would have questioned that judgment except, as is done here, by the process of an appeal. Under these circumstances

there was no clear need for the issuance of an injunction because there was another adequate remedy. *Holt* v. *Wissinger,* 145 Conn. 106, 113-116, 139 A.2d 353, and cases cited therein. The same can be said as to the issuance of the temporary injunction on June 11, 1959.

The trial court was correct in concluding that the contract between the plaintiff and the defendants had been legally terminated and that the plaintiff was under no obligation to arbitrate issues arising out of the negotiation of a new contract. The trial court was in error, however, in granting injunctive relief.

There is error in part, the judgment is set aside and the case is remanded with direction to render judgment as on file except as modified to accord with this opinion.

In this opinion the other judges concurred.