ROBERT L. PATRON ET AL. *v.* SIMON KONOVER ET AL.
(12076)

FOTI, FREEDMAN and SPEAR, Js.

Argued January 14—decision released August 16, 1994

*Richard C. Robinson,* for the appellants (defendants).

*Richard P. Weinstein,* for the appellees (plaintiffs).

SPEAR, J. This case resulted from the plaintiffs'[1] sale of their business interests to the defendants.[2] After a trial of the many issues arising out of the parties' complex business termination agreement, the trial court rendered judgment for the plaintiffs in the amount of $2,874,334.27 plus costs. The defendants' appeal presents the following questions for our review:[3] (1) are

[1] The plaintiffs, Robert L. Patron, Irving Patron and Kenneth S. Patron assert claims on their own behalf. Robert L. Patron and Irving Patron also assert claims on behalf of the Kenneth Patron irrevocable trust in their capacity as cotrustees of said trust, and they also assert claims on behalf of the estate of Marvin M. Patron, having been appointed representatives of that estate. This group is referred to collectively as the plaintiffs.

[2] The defendants are Simon Konover, Doris Konover, Michael Konover, Anna G. Konover, the David Konover trust, Daniel I. Konover, trustee of the David Konover trust, Henry Konover, Theodore Konover, and the Konover family limited partnership. This group is referred to collectively as the defendants.

[3] The defendants listed as an issue in their brief whether the trial court improperly awarded offer of judgment interest under Practice Book § 345 et seq. on prejudgment interest awarded pursuant to General Statutes § 37-3a. The defendants did not brief that issue, however, because they conceded that our decision in *Gillis* v. *Gillis,* 21 Conn. App. 549, 575 A.2d

the plaintiffs entitled to prejudgment interest of $27,568.49 on the cash portion of the purchase price because the defendants delayed the closing of the transaction for a period of seven days; (2) should the plaintiffs receive a credit of $182,963.67 as their pro rata share of joint funds used to construct an addition and improvements to property known as the "Andrews Annex," which was ultimately transferred to the defendants; and (3) are the plaintiffs entitled to $569,720.48 in prejudgment interest on the postclosing adjustments found in their favor by the trial court.

The defendants assert that these awards are improper because (1) the contract allowed for a closing delay of up to thirty days without penalty, (2) the language of the contract prohibits a credit for the Andrews Annex project, and (3) the plaintiffs are entitled to prejudgment interest on the closing adjustments only from the date of notice of default under the contract provisions, not from the date the payments were due. We agree and reverse the judgment of the trial court.

The defendants aptly describe what transpired between the parties as "a largely successful business divorce." For a period of more than thirty years, the plaintiffs and the defendants acquired business interests in more than fifty properties or entities comprised of shopping centers, apartment buildings and other developments in twelve states. Of the properties in which the parties had interests, some were managed by the plaintiffs, some by the defendants and some by other parties. In some ventures, they were equal partners and in others they held unequal interests.

230, cert. denied, 215 Conn. 815, 576 A.2d 544 (1980), controls. In *Gillis*, we decided that interest pursuant to General Statutes § 52-192a must be computed on any prejudgment interest award made by the trier pursuant to § 37-3a. Id., 556.

On September 1, 1988, the parties executed a contract providing for the termination of their business relationships. The contract provided that one party would purchase the interests of the other, the buyer to be determined by a sealed bid process. Each party submitted a sealed purchase bid on November 1, 1988, pursuant to the terms of the contract. The defendants submitted the higher bid and, thus, became the buyers under the contract at a bid price of $28,749,998.

The contract set a closing date of February 1, 1989, with provisions for postclosing adjustments of cash accounts and "major obligations."[4] Further facts will be discussed as the context requires in considering each of the disputed awards.

---

[4] Article 10 of the parties' termination contract provides: "Repairs, maintenance and leasing. From the execution date until the bid date, the entity then managing any property (the 'managing entity') will have the right, for the account of the ownership entity of such property, to undertake obligations with respect to the properties it manages, provided no such obligation is a major obligation, as hereinafter defined. From the execution date until the bid date, any managing entity shall have the right to undertake major obligations for the account of the ownership entities of the properties it manages, provided that, if either Konover or Patron owns or controls such managing entity, the party which does not own or control such managing entity shall be afforded the opportunity to approve or disapprove (not unreasonably in either case) any proposed major obligation; however, the cost of authorized major obligations shall be reimbursed as set forth in the second paragraph of this [article] 10. If a party which does not own or control the managing entity of a property does not disapprove of a proposed major obligation within two (2) business days after its receipt of notification thereof, consent with respect thereto shall conclusively be deemed to be given. In the event that the party from whom approval is sought determines that it must inspect the property, in question, reasonable travel expenses related thereto shall be paid from the K & P Associates account.

"The *high bidder will be responsible for the cost of any repairs, replacement, additions, improvements or other obligations incurred from and after May 15, 1988,* with respect to each property(s) which repairs, replacements, additions, improvements or other obligations either alone or in a series of related transactions creates an obligation which, after deducting that portion thereof reimbursable by tenants, exceeds $10,000 to the entity, owning a property (herein referred to as a 'Major obligation'). For example,

## I

The defendants first claim that the trial court improperly found that the plaintiffs were entitled to prejudgment interest of $27,568.49 on the cash portion of the purchase price because the defendants delayed the closing of the transaction for a period of seven days.

The trial court found the following facts with respect to the delay in the closing of the transaction. On February 1, 1989, the parties met and began the closing activities. Pursuant to the contract, the defendants were obligated to pay one half of the purchase price in cash and to execute a secured promissory note for the balance. At the defendants' request, the closing was continued until February 8, 1989, for payment of the cash portion of the purchase price and completion of the closing activities. The defendants paid the plaintiffs $14,374,999 on February 8, 1989. The parties adjusted all accounts as of February 1, 1989, and concluded the closing except for the adjustments of the cash accounts and major obligations accounts. The trial court found that the defendants' failure to pay the cash portion of the purchase price on February 1, 1989, was a breach of the parties' contract. Accordingly, the court awarded the plaintiffs $27,568.49 as interest, pursuant to General Statutes § 37-3a,[5] for the seven day delay in closing caused by the defendants.

"On appeal, the function of this court is limited solely to the determination of whether the factual findings

---

it is intended by the parties that the property accounts will be used to pay for major obligations incurred after May 15, 1988, and when the cash accounts are substantially adjusted between the parties, there shall be an adjustment in favor of the low bidder equal to the low bidder's pro rata share of the cost of such major obligation." (Emphasis added.)

[5] General Statutes § 37-3a provides in pertinent part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. . . ."

of the trial court are clearly erroneous or whether the decision is otherwise erroneous in law." *Public Works Supply Co.* v. *Eveready Machinery Co.,* 11 Conn. App. 79, 525 A.2d 988 (1987). Determining whether a trial court's decision is clearly erroneous " 'involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, these facts are clearly erroneous.' " *Cookson* v. *Cookson,* 201 Conn. 229, 243, 514 A.2d 323 (1986); *Berlin* v. *Commissioner of Revenue Services,* 207 Conn. 289, 292–93, 540 A.2d 1051 (1988); *Kimberly-Clark Corp.* v. *Dubno,* 204 Conn. 137, 153, 527 A.2d 679 (1987).

The trial court's conclusion that the defendants breached the contract by delaying the closing was legally incorrect. Article 22 (b) of the contract, concerning default, provides: "Time is of the essence with respect to this [article], with the following exception: *In the event that the High Bidder fails to pay the cash portion of the purchase price at closing (which would otherwise be considered a monetary default subject to a three-day notice and cure period), the High Bidder shall have thirty (30) days after receipt of notice to cure its default,* and, with respect to said thirty-day period, time shall be of the essence." (Emphasis added.)

Although neither the trial court's decision nor the plaintiffs' brief discusses this provision of the contract, we deem it dispositive of this issue. "Every provision of the contract must be given effect if it can reasonably be done, because parties ordinarily do not insert meaningless provisions in their agreements." *Connect-*

*icut Co.* v. *Division 425,* 147 Conn. 608, 617, 164 A.2d 413 (1960); see also *Ceci* v. *National Indemnity Co.,* 225 Conn. 165, 175–76, 622 A.2d 545 (1993); *Hatcho Corp.* v. *Della Pietra,* 195 Conn. 18, 23, 485 A.2d 1285 (1985); *A. M. Larson Co.* v. *Lawlor Ins. Agency, Inc.,* 153 Conn. 618, 621–22, 220 A.2d 32 (1966); *Dainty Rubbish Service, Inc.* v. *Beacon Hill Assn., Inc.,* 32 Conn. App. 530, 534, 630 A.2d 115 (1993).

The parties specifically excepted payment of the cash portion of the purchase price from the operation of the "time of the essence" default clause of the contract. They agreed that the buyer would have up to thirty days from receipt of a notice of default to make the cash payment and that time would be of the essence only as to that thirty day period.[6]

The contractual scheme is clear. The defendants, as the buyers, had the right to delay payment at least thirty days from the original closing date, if we assume that a notice of default was received on the original closing date, without being in default. If the defendants had needed a longer period of time, a delay of up to ninety days from the original closing date could have been arranged without penalty under article 7 of the contract by making an additional one million dollar deposit.

In view of this contract language, there is no basis for the trial court's legal conclusion that the seven day

[6] Evidence that the February 1, 1989 closing date was not of the essence is also found in the amended article 7 of the agreement which provides: "The date of closing ('closing') shall be February 1, 1989 *subject to extension as elsewhere provided in this agreement."* (Emphasis added.) Article 7 further provides: "At the election of the High Bidder, the closing may be extended for one period of not more than ninety (90) days. . . . [T]he High Bidder shall on the date of closing pay to the low bidder the additional sum of $1,000,000.00 and the High Bidder's deposit shall simultaneously be paid by the escrow agent to the Low Bidder, both of which sums shall be credited against the purchase price."

delay was a breach of the contract. The fact that the defendants received the benefit of seven days worth of rents because of the delay in closing is irrelevant in light of the express contract provision allowing such a delay.

## II

The defendants next claim that the trial court improperly concluded that the Andrews Annex construction project was a "major obligation" under article 10 of the contract.[7]

On March 24, 1988, an authorized representative of the plaintiffs executed an instrument labeled "agreement to lease" with the United States Postal Service. That agreement was signed by a Postal Service official on May 10, 1988. The agreement provided that the plaintiffs would erect a one story masonry building at 3400 N. Andrews Avenue, Oakland Park, Florida to be known as the Andrews Annex. Construction was to be completed no sooner than sixty days nor more than 180 days after the Postal Service executed the agreement to lease. The building was to contain 19,531 square feet and the plaintiffs were to install the electrical, lighting, heating, air-conditioning, ventilating and plumbing systems. The construction of the building and installation of the systems was to be done at the plaintiffs' expense. Interior renovations were to be constructed by the plaintiffs and paid for by the Postal Service. The design and cost of such renovations were subject to Postal Service review and approval. A rental payment schedule for the first year and five annual renewals was also set out in the agreement.

If the Andrews Annex project was a major obligation as that phrase is defined in the parties' agreement, the entire cost of the construction of the building and

---

[7] See footnote 4.

the required systems would be borne by the defendants as the buyers. This would result in a refund or credit to the plaintiffs of $182,963.67, their pro rata share of the joint funds used to pay for the Andrews Annex project. The purpose of the major obligations clause of the parties' contract was to ensure that the buyer (the high bidder), who ultimately would benefit from the improvements, paid for them if the obligation to improve was incurred after May 15, 1988.[8] All obligations incurred *prior* to May 15, 1988, would be borne pro rata by the parties in accordance with their respective percentages of ownership in the particular property.

It is important to understand the sequence of events and the business context of the termination contract with respect to this issue. The agreement to lease and the construction contract were signed before the business termination contract was executed. At the time the agreement to lease was signed in May, 1988, business was being conducted as usual, with repairs, maintenance and improvements being paid for out of the parties' joint property accounts for the respective properties. On September 1, 1988, the parties signed the termination contract. Until November 1, 1988, no one knew whether the plaintiffs or the defendants would be the high bidders, and, thus, the buyers under the contract. During the interval between the signing of the termination contract and the bid date, the parties needed to continue to carry on their businesses and to take advantage of opportunities such as the Andrews Annex project.

The trial court found that on July 5, 1988, the plaintiffs entered into a contract with Duro Construction Company (Duro) for the construction of the Andrews Annex building and all interior work for a lump sum

---

[8] See footnote 4.

of $438,758. That contract did not mention the agreement to lease between the plaintiffs and the United States Postal Service in its recitation of contract documents. The trial court then made the following finding: "Until the execution of that contract on July 5, 1988, the court infers that the 'total costs of the modifications' had not yet been 'submitted to the Postal Service for review and approval.' Thus, the creation of the obligation occurred after May 15, 1988, and [the plaintiffs] are due $181,963.67[9] for that major obligation."

The trial court's conclusion that the plaintiffs incurred no obligation to construct the Postal Service Annex until the construction contract with Duro was signed was legally incorrect. Although it is true that the plaintiffs incurred no obligation to Duro until the July 5, 1988 contract was executed, they had certainly obligated themselves under the May 10, 1988 agreement to lease with the Postal Service to construct the Andrews Annex. An examination of the agreement to lease reveals that it satisfies all of the requirements for a valid contract. The plaintiffs signed the agreement as an offer on March 24, 1988. One of the terms of the offer was that it was irrevocable for 120 days from that date. The Postal Service accepted that offer on May 10, 1988, thereby obligating the plaintiffs to construct the building.

Had the plaintiffs failed to erect the building, they surely would have been in breach of that contract. A contract requiring that the lessor erect a building pursuant to plans and specifications approved by the lessee is valid and binding. See *KMart Corp.* v. *First Hartford Realty Corp.,* 810 F. Sup. 1316, 1325 (D. Conn. 1993).

---

[9] The quote is taken from the trial court's articulation. The trial court's memorandum of decision, however, allocated the sum of $182,963.67 as a credit due the plaintiffs for the Andrews Annex major obligation.

On appeal, the plaintiffs argue that the trial court properly focused on the intent of the parties as to what was a major obligation. They claim that the trial court's finding was really that no obligation was incurred by the plaintiffs until July 5, 1988, *in the sense intended by the parties in their agreement.* This claim is without merit as there is nothing in the trial court's decision that states or implies that it found that the parties *intended* that the Andrews Annex project would be a major obligation. In its decision, the trial court analyzed only the agreement to lease and the July 5, 1988, construction contract. From those documents, the court concluded that the defendants incurred no obligation until July 5, 1988. There was no finding that the parties intended that the Andrews Annex project would be a major obligation under their business termination contract.

The trial court concluded that the major obligation did not arise until the signing of the construction contract on July 5, 1988, because the Postal Service review and approval was a condition precedent to the plaintiffs' becoming bound under the agreement to lease. "A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract . . . ." (Citations omitted; internal quotation marks omitted.) *Ruscito* v. *F-Dyne Electronics Co.,* 177 Conn. 149, 171–72, 411 A.2d 1371 (1979); see also *Christophersen* v. *Blount,* 216 Conn. 509, 512, 582 A.2d 460 (1990). There is nothing in the agreement to lease, the record, transcripts or exhibits, however, to support a finding of an intent to create a condition precedent to the plaintiffs' obligation to construct the building.

The plaintiffs make two more claims in support of the trial court's finding that the Andrews Annex project was a major obligation. First, they assert that the Andrews Annex project was a major obligation, even if incurred before May 15, 1988, because "most of the major obligations arose from instruments dated before May 15, 1988, because all of them were repairs or improvements to properties pursuant to existing leases." This claim, however, flies in the face of the express contract language that only those obligations in excess of $10,000 incurred *after* May 15, 1988 could *ever* be major obligations.

Lastly, the plaintiffs claim that the parties could have excluded the "Andrews Annex" project as a major obligation in their September 1, 1988 termination contract if they had intended that it *not* be a major obligation. Again, the plaintiffs' reasoning is flawed. The parties' contract did not specifically mention *any* of the major obligations. Rather, the parties intended to rely on the contractual language defining such obligations. Otherwise, there would have been no need for the May 15, 1988 date. The parties would have simply listed the major obligations as of the execution of their contract on September 1, 1988, and provided for the allocation of such expenses incurred after September 1.

The trial court's conclusion with respect to the Andrews Annex obligation has no basis in the evidence or law; therefore, it cannot stand.

## III

The defendants' final claim is that the trial court improperly awarded the plaintiffs statutory prejudgment interest on the postclosing adjustments pursuant to General Statutes § 37-3a.[10]

---

[10] See footnote 5.

The termination contract called for several adjustments to be made after the closing. Article 18 (b) of the contract provided that "adjustments shall be made with respect to cash balances as they exist as of closing and shall be accomplished within 30 days of closing." With respect to major obligations, article 10 provided that "when the cash accounts are substantially adjusted . . . there shall be an adjustment in favor of the low bidder equal to the low bidder's pro rata share of the cost of such major obligation." The trial court found that the defendants failed to discharge their payment obligations to the plaintiffs in a timely manner, and, therefore, awarded the plaintiffs prejudgment interest pursuant to § 37-3a on the cash adjustments from April 1, 1989, and on the major obligations account from January 1, 1991.

In making these awards, the trial court stated that "justice demands this result" because, inter alia, (1) the business termination contract required payment of cash adjustments and major obligations within thirty days of the closing, (2) the defendants failed to utilize article 20[11] of the agreement that provided each party with a method to protect against such an interest award by depositing funds in escrow when there was a bona fide dispute, (3) the plaintiffs fully performed under the contract and did not delay the computation of the postclosing adjustments, (4) the defendants did not supply the necessary information to the accountants for them to complete their major obligations analysis, and (5) the defendants have had the benefit of the money owed to the plaintiffs for the postclosing adjustments.

---

[11] Article 20 of the termination contract provides in pertinent part: "In the event of a bona fide dispute, either Party may pay the disputed sums of money or perform alleged obligations 'under protest'. . . . Any sums of money disputed in good faith . . . shall be paid to the Escrow Agent and shall be deposited by the Escrow Agent into a separate interest-bearing account . . . pending resolution of the dispute."

The allowance of prejudgment interest under § 37-3a is a matter within the discretion of the trial court. *Metcalfe* v. *Talarski,* 213 Conn. 145, 160, 567 A.2d 1148 (1989); *Solomon* v. *Hall-Brooke Foundation, Inc.,* 30 Conn. App. 136, 146–47, 619 A.2d 866 (1993); *Alderman* v. *RPM of New Haven, Inc.,* 20 Conn. App. 566, 569–70, 568 A.2d 1068 (1990). This allowance turns on "whether the detention of the money is or is not wrongful under the circumstances." (Internal quotation marks omitted.) *Lawrence* v. *New Hampshire Ins. Co.,* 29 Conn. App. 484, 498, 616 A.2d 806, cert. denied, 224 Conn. 923, 618 A.2d 528 (1992); *Solomon* v. *Hall-Brooke Foundation, Inc.,* supra, 146. If the trial court determines that one party has wrongfully detained funds, it must next determine the date the wrongful detention began. Where the claim rests on a breach of contract, statutory interest accrues from the date the contract was breached. See *West Haven Sound Development Corp.* v. *West Haven,* 207 Conn. 308, 322–23, 541 A.2d 858 (1988); *Harris Calorific Sales Co.* v. *Manifold Systems, Inc.,* 18 Conn. App. 559, 566, 559 A.2d 241 (1989).

The defendants rely on article 22 (a) of the termination contract in support of their claim that there was no default under the terms of the contract until May 12, 1991, at the earliest and, therefore, there could have been no wrongful withholding of money prior to that date. Article 22 (a) describes an event of default as "the failure of either party to make any monetary payment due under the terms of this agreement within three business days after the defaulting parties receipt of notice thereof from the nondefaulting party." May 12, 1991, is three days after the plaintiffs' May 9, 1991 written notice of default. The defendants, therefore, assert that they are chargeable with prejudgment interest, if at all, only from May 12, 1991. We agree with

the defendants that a default, and thus a "wrongful" withholding, could occur only pursuant to article 22 (a). There are several reasons why that is so.

It is axiomatic that there must be mutual assent to have a valid contractual relationship. The parties are free to contract as they wish unless their contract violates the law, and every provision of their contract must be given effect. *Connecticut Co.* v. *Division 425,* supra, 147 Conn. 617. Our Supreme Court has frowned on interpreting a contract in a way that renders a clause in the contract mere surplusage and inoperative. *A. M. Larson Co.* v. *Lawlor Ins. Agency, Inc.,* supra, 153 Conn. 621; see also *Weil* v. *Beresth,* 154 Conn. 12, 19, 220 A.2d 456 (1966). In the present case, the trial court's award of prejudgment interest rendered the clause defining a monetary default completely inoperative and mere surplusage.

The duty to pay the postclosing adjustments arises out of the contract of the parties. "It is fundamental that interest is allowed on the ground of some contract express or implied to pay it, *or as damage for the breach of some contract . . . .* " (Citations omitted; emphasis added.) *Emlee Equipment Leasing Corp.* v. *Waterbury Transmission, Inc.,* 31 Conn. App. 455, 469, 626 A.2d 307 (1993). A party could not legally or logically be in breach of a contract where no default has occurred under the terms of the contract.

In deciding whether interest is due under General Statutes § 37-3a, a trial court must determine not only whether the money is payable but also whether the detention of the money is wrongful. *White Oak Corp.* v. *Dept. of Transportation,* 217 Conn. 281, 297, 585 A.2d 1199 (1991); *Solomon* v. *Hall-Brooke Foundation, Inc.,* supra, 30 Conn. App. 146; *Lawrence* v. *New Hampshire Ins. Co.,* supra, 29 Conn. App. 498. The

default clause of the termination contract, by definition, makes the detention of money that is due wrongful only *after* a default notice.

The trial court reasoned that the defendants should pay interest, in part, because of their failure to take advantage of the escrow provisions of the contract. A contract must be construed as a whole and all relevant provisions construed together. *Barnard* v. *Barnard,* 214 Conn. 99, 109, 570 A.2d 690 (1990); *Fiddelman* v. *Redmon,* 31 Conn. App. 201, 204, 623 A.2d 1064, cert. denied, 226 Conn. 915, 628 A.2d 986 (1993); *Milhalyak* v. *Milhalyak,* 30 Conn. App. 516, 522, 620 A.2d 1327 (1993). Here, the parties anticipated possible postclosing disputes and delays in the adjustment process and therefore inserted provisions in their termination contract to address these issues. Article 22 (a) provides that there would be no default unless the party claiming the default sent the necessary notice under the contract and article 20[12] provides a mechanism for the parties to protect themselves from statutory prejudgment interest by placing money in escrow where the sum due was in dispute. Only after receipt of a default notice would a party need to take advantage of the escrow provisions of article 20 in order to prevent a later award of interest for the wrongful detention of money.

Finally, the conduct of the parties in carrying out the contract sheds light on their intentions. See *Ruscito* v. *F-Dyne Electronics Co.,* supra, 177 Conn. 170. Here, the conduct of the plaintiffs in sending the notice of default dated May 9, 1991, indicates that the parties intended that there would be no default for failure to pay money when due unless the provisions of article 22 (a) were followed.

---

[12] See footnote 11.

There is no basis for the trial court's award of prejudgment interest from April 1, 1989, on the cash adjustments. The trial court also awarded interest on the Andrews Annex project from January 1, 1991, to the date of judgment. As the Andrews Annex project was not a major obligation subject to adjustment under article 10 of the termination contract, this interest award is also without basis.

The judgment is reversed in part and the case is remanded for further proceedings to recompute the award of damages after eliminating the award of prejudgment interest for the seven day delay in closing, eliminating the Andrews Annex project credit of $182,963.67 and related interest, and eliminating all prejudgment interest prior to the plaintiffs' sending the defendants notice of default pursuant to the default provisions of their termination contract.[13]

In this opinion the other judges concurred.

---

[13] Although the defendants concede that the May 9, 1991 letter was a notice of default, it is for the trial court to determine whether that or some earlier document constitutes the requisite notice.