[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These two administrative appeals have been consolidated inasmuch as they arise out of the same decision of the Department of Public Utility Control (DPUC). The appellant in one case is Connecticut Light and Power (CLP), and in the other, the appellants are Southeastern Connecticut Regional Resources Recovery Authority (SCRRRA), American Ref-fuel Company (Ref-fuel) and Air Products and Chemicals, Inc. (Air Products). The respective appellants' interests are in conflict to each other.
Most of the salient facts in these two appeals are not in dispute. SCCRA generates electricity through a trash-to-energy plant. It is a political subdivision of the State of Connecticut which functions as a resource recovery authority pursuant to Connecticut General Statutes 7-273a et. seq. In anticipation of the construction and operation of the plant, SCCRA entered into an agreement with CLP for its purchase of electricity generated by the plant.
One of the oversight areas of the DPUC is the review and approval or rejection of agreements entered into between CLP and any private producers of electricity. (16-243a). Air Products, (a parent company of Ref-Fuel), and Ref-Fuel, were parties to the agreement as the operators of the plant. CLP is a public utility which, as a public service company, is regulated by the DPUC. The agreement between the parties was submitted to DPUC for approval by petition dated June 8, 1987. Approval was granted by the DPUC on October 6, 1987. It is this approved agreement which became the centerpiece of the instant controversy. CT Page 211
The Decision approving the Agreement between the parties described the Project, as follows:
 The Facility will be designed to dispose of residential, commercial and non-hazardous industrial municipal solid waste (MSW) generated in the member municipalities of SCRRA pursuant to municipal service contracts between the member municipalities and SCRRRA. The solid waste will be burned through the use of a mass-burning grate system and boiler combination to produce steam to energize turbines which will generate electricity. The Project's electricity will be used to operate the Facility and made available for sale to CLP.
 The Facility will have an approximate gross output of 16.0 MW and a net output for sale of about 13.85 MW. The Facility will process approximately 180,000 tons of MSW annually at a rate f 600 tons per day assuming 500 Btu per pound of waste. SCRRRA expects that the Facility will operate seven days a week, 365 days a year. With an availability factor of 82%. (Emphasis added).
The 1987 decision by DPUS resolved two questions essential to the determination of this appeal.
"1. Whether CLP must purchase the entire electric energy output pursuant to C.G.S. 16-243e;
2. Whether CLP must purchase a portion of the electric energy output at a front loaded rate equaling CLP's full avoid costs over the life of the contract. . . ."
In consideration of these questions, the DPUC reviewed the statutory language of C.G.S. 16-243e.[1]
After substantial written consideration of the positions of the respective parties, DPUC found as a matter of fact that ". . . SCRRRA has agreed to sell all of its output to CLP, and will make efforts to maximize on-peak production." It also ruled: CT Page 212
"In regard to the applicability of C.G.S. 16-243e, the Department hereby rules that payments at the municipal rate are applicable to this case. Payments to the Project shall be made at that rate for the first 20 years of its operation, and at the Company's Block 2 rate for the remaining five years."
Per the 1987 DPUC decision, CLP and the generating parties entered into an agreement consistent with the DPUC decision. That agreement is the Electric Energy Purchase Agreement (EEPA). The plant was built. There is no dispute between the parties that the plant was built pursuant to the plans and specifications and so certified by the parties' respective engineers, to DPUC.
From January, 1992 through December, 1993, the plant had a permit to burn to a limit of 600 tons per day. On December 9, 1993 they received a rise in that limit to 689 tons per day. The output of the plant has fairly consistently exceeded 16.00 MW gross output and 13.85 MW net output for sale after December, 1993, measured monthly. Measured monthly it never exceeded 13.95 MW, but did when measured in smaller increments. CLP claimed the right in the instant controversy to pay the 16-243e rate to 13.85 MW and to pay the avoided cost rate (Rate 980) to output above 13.85 MW.[2] The DPUC concurred with CLP. The first of these appeals is from that decision. In the same decision, DPUC ruled that the calculation to determine the proper payment should be performed on an "average monthly" basis rather than the hourly basis (as had been requested by CLP. Thus CLP brought the second of the consolidated appeals before this court.
The standard of review for these administrative appeals is found at C.G.S. 4-183:
 The standard of review for these administrative appeals is found at C.G.S. 4-183:
 The court shall not substitute tits judgment for that of the agency as to the weight of evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory CT Page 213 authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
 I. Appeal of SCRRRA, Ref-Fuel and Air Products
The appellants challenge the decision of the DPUC regarding the rate above 13.85 MW production on several bases: 16-243a(b) provides "Each electric public service company . . . shall (1) Purchase any electrical energy and capacity made available, directly by a private power producer. . . ." This statute's language has remained unchanged during all times relevant to this action. SCRRRA constitutes a private power producer under C.G.S. 16-243b
and 22a-260.
(1) They claim the decision is in violation of C.G.S. 16-243e;
(2) That it was made upon unlawful procedure, to wit: the conclusion that energy generated above 13.85 MW was to due to energy savings procedures, without the allowance of testimony;
(3) That it improperly interpreted the agreement (EEPA) between the parties.
Connecticut General Statute The statute at issue, C.G.S. 16-243e
has undergone amendment during the pendency of this action. At the time of the issuance of the 1987 DPUC decision and the signing of the EEPA, the statute, in salient part, read: "Any electric company, as defined in section 16-1, purchasing electricity generated by a resources recovery facility, as defined in section 22a-260, owned by or operated by or for the benefit of a municipality or municipalities, shall enter into a contract with the owner of such facility requiring the electric company to purchase such electricity . . . at the same rate that the electric company charges the municipality or municipalities for electricity." In 1994, P.A. 94-92, Sec. 1 amended this statute, so that the language instead of reading ". . . to purchase such electricity . . ." it was amended to provide ". . . to purchase all of CT Page 214 the electricity generated at such facility. . . ." Appellants argue that the legislative history of this amendment makes clear that from the beginning the Legislature intended the municipal rate (which here is also the contract rate) applies to all electrical energy generated by a municipal waste facility. This statutory amendment, however, has no retroactivity, lacking the necessary language for the same. Therefore, the appellants are left to the plain language of 16-243e in effect prior to the 1994 amendment, its legislative history and Connecticut case law construing the same.
The only case in Connecticut construing 16-243e (previously referred to in a footnote) was Connecticut Light Power Co. v.Department of Public Utility Control, 210 Conn. 349 (1989). The portion of 16-243e construed in that case, was the rate to be paid by CLP for energy generated by municipalities who were not customers of CLP under the EEPA between the parties here. In referring to the underlying 1987 DPUC ruling, the Supreme Court noted the DPUC ruling concluded that Sec. 16-243e required CLP to purchase all of SCRRRA's electrical output for twenty-five years and to pay for the same at the "municipal rate: for the first twenty years of the contract." At p. 356. Now DPUC has found and further ruled that as a matter of interpretation of law, that this applies only to the originally estimated MW, and not to any excess production.
As stated by the Supreme Court in its first look at one portion of 16-243e:
 Generally, this court accords `considerable deference to the construction given by the administrative agency charged with its enforcement.' Sutton v. Lopes, 201 Conn. 115, 120, 513 A.2d 139, cert. denied sub nom. McCarthy v. Lopes, 479 U.S. 964, 107 S.Ct. 466, 93 L.Ed.2d 410 (1986). However, `the construction of a statute on an issue that has not previously been subjected to judicial scrutiny is a question of law on which an administrative ruling is not entitled to special deference.' Schlumberger Technology Corporation v. Dubno, 202 Conn. 412, 423, 521 A.2d 569 (1987)." Ibid at p. 357.
This court finds that DPUC erred in not requiring CLP to pay CT Page 215 the municipal rate for any electrical energy generated by the plant in question. While the plant may have exceeded its estimated nameplate capacity, and it may have done so for non-energy saving reasons (including increase in ___________ burned), there is absolutely no contemplation in the statutory scheme of 16-243e for electricity generated by a municipality which is a CLP customer to purchase at anything other than the municipal rate.
CLP and DPUC try to argue that by contract, the parties could agree to limit the application of 16-243e and that this is what they have done here. Before entertaining this head on, it provides other fodder for problems with the DPUC decision. Even if the parties could so agree to limit 16-243e's application to 13.85 MW, then DPUC has in turn gone on to impose a rate for output over 13.85 MW that was nether agreed to by the appellants nor find any authority in statute. Nowhere in 16-243e does it state that CLP can default to or DPUC can impose the Rate 980 for municipally generated electrical energy.
Counsel each argue to New York authority seeking to continue the decision of the DPUC. However, where the law in Connecticut provides sufficient controlling authority, this court need go no further.
What controls between these parties is the language of the applicable statutes and the Agreement of the parties read in light of the statutes. If a contract is clear on its fact its language controls.
""In determining the meaning and effect of the controverted language in the [agreement], the inquiry must focus on the intention expressed in the [agreement] and not on what intention existed in the minds of the parties." (Internal quotation marks omitted.) Gateway Co. v. DiNoia, supra, 232 Conn. 231. "When the plain meaning and intent of the language is clear, a clause in a written [agreement] cannot be enlarged by construction. There is no room for construction where the terms of a writing are plain and unambiguous, and it is to be given effect according to its language. (Internal quotation marks omitted). Id., 232. Finally, "[e]very provision of the contract must be given effect if it can reasonably be done, because parties ordinarily do not insert meaningless provisions in their agreements." Connecticut Co. v.Division 425, 147 Conn. 608, 617, 164 A.2d 413 (1960); see alsoCeci v. National Indemnity Co., 225 Conn. 165, 175-76, 622 A.2d 545
(1993)."" Snydergeneral Corp. v. Lee Parcel 6 Associates Ltd.CT Page 216Partnership, 43 Conn. App. 32, 36-37, ___ A.2d ___ (1996).
The terms of the Agreement that the parties respectively urge on the court are all ____________ to the DPUC findings in approving it which include:
"[5.] The facility will have an approximate gross output of 16.00 MW and a net output for sale of about 13.85 MW."
"[12.] SCRRRA has agreed to sell all of its output to CLP, and will make all efforts to maximize on-peak production."
Further, the DPUC found, [i]n regard tot he applicability of C.G.S. § 16-243e, a the Department hereby rules that payments at the municipal rate are applicable in this case[,] and ". . . the contract is hereby approved, conditioned upon the development and construction of the Project as currently represented by the Petitioner." There is no dispute that the latter occurred.
The Agreement, in its premises, itself recognizes that CLP is required to purchase the electricity at the municipal rate.[3] The definitions describe the facilities incorporating Exhibit A. There has never been a dispute between the parties that the facility was constructed in conformity therewith. Paragraph 10 of the Agreement requires "_____________ shall deliver to buyer and buyer shall purchase from seller the entire net electric output of the facility. . . . (emphasis added). Payment is provided only at the Municipal Rate, once the plant is properly certified. No alternative or ____________ rate is provided. (Paragraph 11 of the Agreement). The statute, § 16-243e neither allows for nor anticipates any other rate.
"A court simply cannot disregard the words used by the parties or revise, add to, or create a new agreement." Collins v. Sears.Roebuck Co., 164 Conn. 369, 374 (1973). "A term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument."Texacon, Inc. v. Rogow, 150 Conn. 401, 408 (1963)." Ibid at p. 598.
The record and statutory scheme provide no support for the decision of the DPUC. The decision was clearly erroneous in light of the record and abuse of its discretion and in violation of C.G.S. § 243e. CT Page 217
The appeal is sustained. The matter is remanded to the DPUC to modify its decision in accordance with this judgment and enter orders directing payment, with interest pursuant to paragraph 13 of the Agreement, from CLP to the appellants.
 II. Appeal of CLP
(It should be noted that CRRA supports the appeal position of CLP). The claim of error made by the appellant here is that there is no substantial evidence in the record to support DPUC's decision that rates should be calculated on an "average monthly basis" rather than an "hourly" basis.
In deciding that the output should be calculated on an "average monthly basis". The DPUC stated that this method of calculation would ". . . take[s] into account the day-to-day and hourly fluctuation in production and unavoidable variations attendant to solid waste fuel. Certainly, variations in Btu content and moisture can cause changes in heat, steam and electricity production on an hourly basis." Citing to the record before it the decision goes on to note that this type of variation ". . . often occurred to the plant's production during 1992 and 1993, prior to the time of the Facility's permit amendment."
The sole question before the court on this issue is whether the record supports the DPUC decision on this issue, or, whether the decision was devoid of support in the record and arbitrary or capricious. New Haven v. Freedom of Information Commission,205 Conn. 767, 773-4.
The record reflects that there is a variability of the amount of output from trash — to — energy plants. Further, it reflects that the variability is not pronounced when the output is measured hourly when compared to a monthly measurement.
The record further reflects that CLP has historically calculated its payment for the energy on a monthly basis.
Finally, that this issue was squarely before the DPUC and CLP was aware of it can be easily gleaned from the Interrogatories from DPUC addressed to CLP. The responses from CLP to DPUC reflect the output measured hourly, daily and monthly. (Record VI.2). CT Page 218
Therefore, the court (finding sufficient basis in the record to support this aspect of the DPUC decision) finds no merit to the appeal.
Therefore, this appeal is denied.
Lynda B. Munro, Judge