[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff herein, Lawrence Robstock, Jr. (Robstock) has brought this action against the defendant Iroquois Gas Transmission System L.P. (Iroquois) alleging that Iroquois, in the course of laying a pipeline across Long Island Sound, caused a disturbance of the bed of the Sound which resulted in an accumulation of silt upon his oyster bed to such a degree that it was no longer viable for the growth and harvesting of oysters.
The plaintiff has a leasehold interest from the State of Connecticut in the subject oyster bed. This bed lies off the coast of Milford, Connecticut, and is identified as L. 447. The lease was initially acquired in 1988 and renewed thereafter. It is presently in effect.
The defendant Iroquois is in the business of transmitting natural gas which, in this instance, flows through a pipeline CT Page 520 running from the Canadian border through the states of New York and Connecticut, terminating in Northport, Long Island in the State of New York. In order to reach its terminal point in Long Island, it was necessary to cross Long Island Sound, the crossing beginning at a point along the Milford shoreline in the area of Silver Sands State Park. The specifications for the crossing required the excavation of a trench of varying depth in the seabed of the Sound The soil excavated from the trench by way of a clamshell dredge was initially brought to the surface and released on the westerly edge of the trench, the edge nearest to L447. Subsequently, it was excavated and emptied along the westerly side of the excavation without bringing the dredge to the surface. At a certain point where the soil was found to be more adhesive, a large plow was used. The material excavated is known as "spoil". The spoil remained at the bottom, in some instances several weeks, being subject to dispersal by storms and varying currents. The pipe itself, including its outer layer of cement, had a diameter of approximately 32 inches. Once this pipeline was laid, the spoil that remained alongside the trench along with an additional 20,000 cubic feet of spoil brought in by barge was deposited in the trench. The same clamshell method was used in covering the pipeline. After the trench was filled, a beam was employed to drag the bottom, leveling off any high spots that remained.
Mr. Robstock contends that the construction of the pipeline caused such a dispersal of the spoil upon the currents existing in that area of the Sound and by the storms that occurred as well as the dispersals of the spoil purchased by Iroquois in order to return the bottom to its former condition that a sufficient amount of sediment or silt blanketed his leasehold to a depth of up to 1 inches, creating a condition whereby the oyster larvae would not set.
Robstock contends that the random dredging on L447 subsequent to 1988 and prior to completion of the pipeline disclosed the presence of growing oysters not yet ready for harvesting in the two year old range. Subsequent to the completion of the pipeline, dredging of L447 disclosed the presence of silt or sediment on the dredge and that the oysters dredged were dead or dying Robstock claims that L. 447 in its present condition is incapable of producing mature oysters available for marketing. He is seeking damages from the defendant Iroquois
In order for Iroquois to construct the pipeline, it was necessary that permits authorizing the construction be obtained CT Page 521 from the appropriate federal and state agencies. On November 9, 1990, the Coastal Resources Management Division of the Connecticut Department of Environmental Protection notified the Federal Energy Regulatory Commission in the matter of
 "Federal Coastal Consistency for the Iroquois Gas Transmission System pursuant to 15 C.F.R. § 33, Section 930, that:
 . . ., the department hereby certifies the proposed IGTS project as consistent with Connecticut's federally-approved coastal management program, subject to strict adherence to the following conditions as agreed to by the Department of Environmental Protection." (Emphasis added.)
Among the conditions requiring strict adherence are condition number 10 and condition number 11. They read as follows:
 10. "The licensee shall monitor the pre- and post-construction conditions of oyster beds within Long Island Sound. Any damage to the oyster-beds shall be promptly restored to pre-construction conditions. The licensee shall mitigate impacts to shellfish beds by allowing leaseholders to harvest the beds prior to construction and by compensating for lost resources. After construction, shellfish beds shall be restored and cultch replaced to Department of Agriculture-Aquaculture Division, National Marine Fisheries Service and leaseholder's satisfaction." (Emphasis added).
 11. If pipeline construction precludes any shellfish harvesting the licensee will financially reimburse leaseholders for full market value of the resource impacted to satisfaction of shellfish bed leaseholders."
As a beneficiary of this agreement, the plaintiff seeks to enforce the same.
The plaintiff testified at trial that at the time of acquiring his leasehold interest, his dredging of Lot 447 at the four corners and the center of the lot found oysters approximately one year old, too young to market. It was disclosed that during the period between his acquisition of the lease and the construction of the CT Page 522 pipeline, oysters in the one to two year old category were found. Random dredging disclosed a surface that was fairly clean, conducive to the growth of oysters. In 1991, he became concerned with silt on the ground. It was then that he discovered loose mud or silt covering the leasehold. He contacted John Volk of the Bureau of Aquaculture who in turn placed him in contact with Andrew Rehm, a representative of Iroquois. On July 12, 1991, Rehm and Robstock visited Lot 447. A video taken by Rehm at that time showed the surface of the leasehold to be covered with a light fluffy material referred to as mud or silt. The video of the Robstock lease is post-construction and does not show pre-existing conditions. Copies of the video were sent by Robstock to Mr. Clyde MacKenzie, a marine biologist employed by the National Marine Fisheries Service of the U.S Commerce Department.
The video taken on July 12, 1991 by the consultant Rehm was forwarded by the plaintiff to Clyde MacKenzie for his opinion as to the condition of Lot 447. At an admitted depth of 1" to 1.25", Mr. MacKenzie in his reply indicated that the present conditions would make it impossible for oysters to set, thus making Lot 447 useless while it remained in that condition. It was his opinion that this condition was not brought about by any natural or series of natural events.
Mr. MacKenzie, a specialist in shellfish habitat, had during the 1960's and 1970's, made several dives in the area and was familiar with conditions in that area of Long Island Sound. He has done considerable work regarding silt on oyster beds. From his examination of the video taken by Rehm, it was his opinion that the oysters found at Lot 447 were from two to four years of age and could not have set in the silt that existed thereon. His conclusion was that these oysters had set in 1989 and that in the future the only set would be on the shells of the oysters protruding about the silt. It was his opinion that the silt came from the construction of the pipeline and could not have come from any alternative source such as storms. They could not have produced the amount of silt generated here. In addition, runoff from the shore or river runoff had little, if any, effect. MacKenzie indicated that it would take 1000-1500 bushels of cultch to seed the average lot. However, because of the condition of Lot 447, he indicated it would take 6000 bushels of cultch to accomplish the same.
The defendant Iroquois engaged the service of Mr. Charles Bohlen, an oceanographer, as the project consultant. It was his CT Page 523 opinion that the pipeline construction did not cause the accumulation of silt on Lot 447 but that it could have come from other sources both offshore and onshore. While he indicated that river runoff could have contributed, his testimony was that there was little data concerning the Housatonic River and none concerning the rivers emptying into Milford Harbor.
Mr. Bohlen conducted a study of currents in the area and for this purpose placed several sampling stations on the interface of the Sound. These testing stations were employed to measure the sediment fallout just above the surface. Based on the results of these samplings, Mr. Bohlen arrived at a mathematical conclusion that the silt covering Lot 447 did not come from the pipeline dredging. While this experiment would measure the amount of sediment fallout passing over the array at that depth and location, it did not take into account the lighter sediment which was in the water above the sampling stations which the currents would carry to a further degree.
The court finds, based on all the expert testimony presented, that the silt which was found on Lot 447 came from the dredging of the pipeline, causing Lot 447 to be unable to accept a set, thereby precluding oysters from being cultivated. The court finds that Iroquois has not complied with the terms of its permit with the Bureau of Aquaculture and the federal agencies as found in the consistency letter setting forth the conditions to be met by Iroquois in the event of damage or destruction of oyster beds.
One of defendant's claims is that he has been subsequently discharged because of an agreement between the Connecticut Department of Agriculture, the DEP and the defendant. Two of the signatories to this agreement were the two largest companies in the area of the pipeline engaged in the farming of oysters. Were such a claim to be of any merit it would allow the pipe line owner to settle claims of the larger companies to the detriment of the various small owners. This would fly in the face of the terms set forth in the Consistency Certificate Letters with its avowed intent to protect all of the parties that are impacted.
While Iroquois is responsible for damages to Lot 447, it is the obligation of Robstock to mitigate his damage "The plaintiff `clearly has a duty to exercise reasonable conduct to minimize damages incurred by defendant's breach.'" West Haven SoundDevelopment Corporation v. West Haven, 201 Conn. 305, 332. When Robstock first acquired the subject lease, the oysters found there CT Page 524 were only one year old, not ready for marketing. In 1990, he began to market oysters found there. In 1991, he became concerned with the silt found on his leasehold. In 1992, there was no harvest, Robstock continued dredging off and on along the east and north boundaries. In 1993, he tried the center and found conditions better. In March of 1994, he engaged Mr. Gleason, a natural oysterman, to dive on Lot 447. Mr. Gleason found oysters covered with silt. He determined that there was approximately 450 bushels per acre and found 50 percent of the oysters to be alive. At that time, litigation had already commenced, the return day being February 28, 1993. The day prior to the commencement of the trial, Mr. Gleason again dove on Lot 447 at which time his findings were that there were no live oysters. As an oysterman, Mr. Robstock became aware of the deteriorating condition of his oyster bed, knowing that silt in the quantity found in 1991 by early 1994 would not support the growth of oysters. At no time did he attempt to harvest the remaining oysters, 50 percent of which were determined by Mr. Gleason, an experienced oysterman, to be alive in March of 1994. Based on this conclusion, the court finds that Mr. Robstock failed to mitigate his damages.
Iroquois contends that Robstock should have made use of power dredges and excavators and resuspended the silt, allowing the currents to disperse the same, permitting it to settle elsewhere. It is their position that Conn. General Statutes § 26-215 permits this to be done. With this conclusion, the court does not agree. Sec. 26-215 does not permit the use of power dredges to resuspend any sediment. Such use obviously refers to the harvesting of shellfish. The use of excavators is limited to the deepening of waters where no natural oyster beds existed within the last ten years and, in addition, would require the permission of the Commissioner of Agriculture after a notice and hearing. In the present situation, the resuspension of any sediment or silt to the degree present here would result in its being deposited on the beds of his neighbors. Such a course of action the court does not find to be "reasonable action to lessen the damages". Keans v.Bottiarelli, 35 Conn. App. 239, 243, 645 A.2d 1029, cert. denied,231 Conn. 934 (1994).
The defendant Iroquois cites Palmer v. The Hartford DredgingCo., 73 Conn. 182, 190 47 A.2d 125 (1900) for the proposition that the proper measure of damages is "the market value of the oysters as they then existed upon the ground as a growing crop. " They are ignoring the fact that they themselves have agreed to a different measure of damages set forth in conditions 10 and 11 of the CT Page 525 Consistency Certification Letter. Parties are generally free to contract as they wish for whatever terms they might agree on.Patron v. Conniver, 35 Conn. App. 504, 518, 646 A.2d 901, cert. denied 231 Conn. 929, 948, 648 A.2d 879 (1944). By agreeing to the terms of the Consistency Certification Letter Iroquois has agreed to a liquidation of any damages that may occur. They have agreed to "financially reimburse leaseholders for full market value of the resource impacted." Consistency Certification Letter, Condition 11. It is at the dock where market value is normally established. It does not provide that damages are measured by any other location. The only evidence of market value that is before the court is $50.00 per bushel, irrespective of age or size.
Considering 225 bushels per acre to be viable at a price of $50.00 per bushel on a lot comprising 50 acres in size, the court finds Robstock's damages to be $562,500.00. Judgment may enter accordingly.
The Court
By Curran, J