[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO SET ASIDE, MOTION FOR REMITTITUR, MOTION FOR NEW TRIAL, MOTIONS FOR INTEREST, AND MOTION FOR ATTORNEYS FEES AND PUNITIVE DAMAGES
On February 14, 2002, the jury returned a verdict of $6.7 million in favor of Northington Partners, Inc. ("Northington"), the plaintiff. The defendant, Executive Risk, Inc. ("ERI"), has timely filed a Motion to Set Aside the Verdict, a Motion for Remittitur to Reduce Verdict, and a Motion for New Trial. The plaintiff has timely filed Motions for Interest pursuant to Connecticut General Statutes §§ 37-3a and 52-192a and a Motion for Attorneys Fees and Punitive Damages.
Trial Evidence and Procedure
At the trial of this action, which lasted five days, the jury heard evidence, the pertinent portions of which are briefly summarized herein. Northington is an investment banking and venture capital firm which was formed in 1989 by Thomas Leonardi, current president of Northington, and others who had a background in investment banking with respect to the insurance industry.
In the early 90's Northington proposed to the Connecticut Legislature the concept of providing state income tax credits to companies who invested in expanding the insurance industry in Connecticut. This proposal led to the Connecticut Insurance Reinvestment Act,Public Act 94-214, codified in Connecticut General Statutes § 38a-88a (the "Act"). In support of the passage of the Act Mr. Leonardi stated to the Insurance and Real Estate Committee of the Legislature that" [the tax credit allowed under the Act] could include existing companies here but it would have to be companies that needed additional capital to expand their business or to apply our (sic) other business which would allow them to create new jobs." Connecticut Joint Standing Committee Hearings, Insurance Real Estate, 1994 Session, p 107 (Emphasis added). CT Page 12582
In 1997 ERI, an insurance company with its offices in Simsbury, Connecticut, was in the process of expanding its business by constructing a new building. Mr. Leonardi read about the expansion, and contacted Robert Deutsch, Chief Financial Officer of ERI, to determine if ERI was interested in obtaining tax credits for amounts it expended for its expansion. Deutsch and others from ERI advised Leonardi that ERI was, of course, interested in obtaining tax credits, but since ERI did not need additional capital for its new building project, which was already under way, they questioned whether the Act would apply to ERI.
Leonardi told ERI that even though it did not need additional capital, the Act could still apply to provide ERI with tax credits if it obtained a loan from three investor banks. ERI agreed to this process but advised Leonardi that it did not want to incur additional debt which would exist beyond 1998 because such debt would have to be publicly disclosed and could hurt ERI's financial rating by unfavorably affecting its debt/equity ratio.
After negotiations which lasted about one and a half months Northington and ERI entered into an Agreement on January 28, 1998 (Exhibit 10 at the trial) under the terms of which Northington agreed to represent ERI to "explore whether the State of Connecticut would provide significant tax credits to ERI if it were to expand operations in Connecticut." The Agreement further provided that
 A) Northington will consult with and advise ERI on all aspects of the Act. It will represent ERI in the structuring of a proposal to be made to the Connecticut Insurance Department ("CID"), the Connecticut Dept. of Economic and Community Development ("DECD"), the Connecticut Dept. of Revenue Services ("DRS") and such other administrative agencies and/or legislative bodies as may be necessary to determine whether the State would agree to the granting of tax credits under the Act in exchange for ERI's commitment to create a significant number of new jobs in Connecticut. This will include providing presentation materials and financial models.
 B) Northington will, if determined to be feasible, establish and manage a specific fund (the "Fund") complying with all requirements of the Act, which Fund would invest its entire investable capital in ERI, resulting in ERI's creation of a substantial number of new jobs as defined in the Act.
C) Northington will represent ERI in the drafting and CT Page 12583 negotiation of one or more Memoranda of Understanding ("MOU's) relating to the granting of tax credits.
 . . . . . Compensation: In consideration of the services to be provided by Northington, as detailed above, ERI will pay compensation as follows:
 Retainer — The retainer will be paid to Northington in three stages : (i) $25,000 in cash within ten (10) days following the execution and delivery of this letter by Northington; (ii) if there is a mutual agreement to proceed with a meeting between ERI and state agency personnel then $25,000 will be paid to Northington within ten (10) days following the first meeting among Northington, ERI and state agency representatives, provided that, such meeting does not result in ERI deciding to terminate the project; and (iii) $50,000 to Northington within ten (10) days of the execution by DRS of a MOU providing a specific dollar amount of tax credit benefit to ERI (or assignable to ERI) under the Act.
Success Fee — Withing ten (10) days of each realization of tax credit benefit, there will be a success fee paid to Northington equal to 7% of the Realized Value of each tax credit to ERI under the Act. "Realized Value" for this purpose means (i) the face amount of any MOU tax credit to the extent used directly by ERI to offset Connecticut tax liability, and (ii) the actual value of cash or property transferred to ERI by a third party in exchange for such party's being assigned the MOU tax credit or being made otherwise able to utilize the MOU tax credits.
 In the event some or all of the MOU tax credit becomes unavailable to ERI due primarily to an act or circumstance within ERI's control (for example, our failure to maintain in-state employment at specified levels), then immediately upon the happening of such disqualifying event, ERI will pay Northington 7% of the lost MOU credit (s) at (i) the nominal value os such lost MOU tax credit (s), if such event occurs prior to any transfer or realization of value, or (ii) the average historical Realized Value rate, is such event occurs after one or more transfers of MOU tax credit for value have established a realization rate.
CT Page 12584
ERI paid Northington the initial $25,000 due under the Agreement and in March 1998 provided Northington with financial information regarding the construction costs of the building expansion project and estimates concerning the additional insurance jobs which ERI would add over the course of 10 years. Under the Act, significant tax credits are available to investors who invest in insurance businesses which either relocate to Connecticut or expand their existing businesses to create new jobs in Connecticut. In this case, the proposal was to create a fund to be managed by Northington (the "Fund") in which three investors would lend up to $95,000,000. The Fund would, in turn, invest in ERI. If ERI created 155 new jobs over a four year period, the investors in the fund would receive $15,000,000 in tax credits which would then be assigned to ERI as an incentive for it to create the new jobs. If ERI created 551 jobs over a four year period, it would receive $95,000,000 in tax credits.
Northington's responsibility was to structure the transaction and secure from DECD and DRS a signed Memoranda of Understanding ("MOU"), memorializing their commitment to award $15,000,000 of tax credits and to recommend a total of $95,000,000 of tax credits to the General Assembly for approval. Under the Act DECD may award only $15,000,000 in tax credits and credits over that amount must be approved by the General Assembly. Northington secured those MOUs after months of negotiation. The MOUs signed by DECD and DRS are dated November 17, 1998 and November 18, 1998, respectively. The MOU signed by DECD provided in pertinent part:
Investment Fund
 Northington is in the process of forming the Fund. One of Northington's primary objectives as the Fund Manager is to insure the allowability of Tax Credits permitted under the Act (herein, "Tax Credits). To this end, Northington and the Fund will only invest in businesses that meet the requirements of the Act. . . .
 Target Company
 As the Fund Manager, Northington intends to invest the entire amount of the capital of the Fund in ER [ERI], a Connecticut-headquartered insurance holding company which owns two Connecticut-domiciled insurance companies, and/or one of ER's wholly-owned subsidiaries. . . .
 . . . . . Job Creation Incentive
CT Page 12585
 As stated in paragraph 5 of the Credit Eligibility section above, credits may not exceed $15 million as a result of a fund's investment in any one company unless, pursuant to the Act, after review of the economic benefits, DECD recommends a greater amount to the General Assembly. Upon review of pro forma financial projections and representations by ER regarding job creation, DECD agrees to recommend to the General Assembly, not later than January 31, 1999, the total credits in the amount of $95 million, as described herein, be allowed in this transaction. Since the signatories to this agreement cannot know how the General Assembly will respond to the recommendation of DECD, this Memorandum of Understanding provides for a minimum of $15 million in credits for 155 new jobs in the state (the "Base Case") prior to December 31, 2001.
 . . . . . If the General Assembly does not agree to provide the company with any credits above the $15 million limit, or does so on terms unacceptable to the Company, then none of the provisions or requirements concerning additional job creation in the immediately preceding paragraph shall apply, and the company shall only be required to create 155 new jobs by the end of the fourth year, and only be required to comply with the provisions of the Act for ten years as set forth therein.
Once the MOUs were signed, all that was left to accomplish was to secure the investments into the Fund. At trial ERI presented evidence that Northington was supposed to procure the investments in the Fund and Northington claimed that that was ERI's responsibility.
When Northington called ERI on November 18, 1998 to report that the MOU's had been signed, it was told that ERI was still in the negotiation stage with its lenders, and specifically, Fleet Bank. At this point, ERI had only five weeks to complete an extremely complicated transaction by the December 31, 1998 deadline. Northington presented evidence to the effect that it was shocked by ERI's inexplicable delay in bringing this aspect of the transaction to a conclusion.
In early November, 1998, prior to the date on which the MOU's were signed ERI requested an opinion from legal counsel on the legality of the tax credit transaction. ERI was concerned that since the purpose of the Act was to secure new capital for insurance industry job expansion, and CT Page 12586 it did not require new capital, that borrowing money from banks under a revolving loan, which money it repaid within a matter of days or weeks, would be deemed to be a sham transaction.
Northington was surprised that ERI had waited until the eleventh hour to seek a legal opinion. On November 23, 1998, when Northington and ERI sat down with that outside counsel from the law firm of Day, Berry Howard, Northington was told for the first time that ERI wanted Northington to provide DECD with further details about the transaction and secure yet another written memorialization of DECD's support. More specifically, ERI's attorney from Day, Berry Howard wanted DECD to know that the investors were contemplating making a revolving loan to the Fund which would be of a short term nature.
Northington presented evidence that it was surprised by this request. ERI had been involved in much of the discussions with DECD and DRS concerning the framework of the MOU, and had never raised the issue before.
Two days after the November 23, 1998 meeting, Fleet Bank, who was also represented by another attorney from Day, Berry Howard, indicated that it too wanted a supplemental letter from DECD indicating that DECD was aware that the revolving loan would be of a short term nature. Northington argued to the jury that the temporal proximity of these two requests was more than mere coincidence, and that ERI and Fleet, with the assistance of their attorneys, who were law partners, were conspiring to derail the tax credit transaction which Northington had worked on for almost a year.
Thereafter, Northington attempted to have DRS and DECD sign further commitments acknowledging the particular aspects of Fleet's[1] loan. DRS signed the Agreement. DECD declined, expressing reservations because it could not understand why it was being asked to sign off on something it had already approved.
Northington continued its communications with DECD until December 23, 1998. when, in a telephone communication with Tim Curry, counsel for ERI, Northington learned that in addition to the problem of DECD's refusal to sign a document which indicated that it was aware of the short term nature of the loan to the Fund under the MOU, ERI also was not willing to agree to pay all of the bank fees requested by Fleet.
As of December 23, 1998, Northington indicated that it did not believe that the tax credit transaction was viable. This was due to ERI's inability to obtain the loan from three investor banks called for under CT Page 12587 the terms of the MOU. Several weeks later Northington learned that ERI had been planning to merge with Chubb. another insurance company, since late October or early November.
At trial Northington presented evidence from which the jury could have inferred that the Chubb merger with ERI was the primary factor in ERI's decision to abandon the deal the parties had spent the entire year attempting to close. ERI presented evidence that Mr. Curry, the primary person at ERI responsible for the tax credit transaction with Northington, was unaware of the possible Chubb merger until after the transaction unraveled and that ERI's request for a legal opinion that the tax credit transaction was valid was prompted by its desire to avoid involvement in an illegal transaction.
The jury's verdict was in the form of a combined interrogatory! verdict form. The jury found in favor of Northington on the First Count of the Complaint, breach of contract, and on the Second Count of the Complaint, breach of the covenant of good faith and fair dealing, and awarded damages in the amount of $6.7 million. The jury also found in favor of Northington on the Third Count of the Complaint which alleged a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), awarded one dollar in nominal damages and no actual damages.
Discussion of the Law and Ruling
The decision to set aside a jury verdict is a matter within the broad legal discretion of the trial court. Melo v. Spencer, 62 Conn. App. 727,729-30, 774 A.2d 217 (2001). A trial judge has the duty to set aside a verdict and grant a new trial when he or she finds the verdict to be so clearly against the weight of the evidence in the case as to indicate that the jury did not correctly apply the law to the facts in evidence in the case. Birgel v. Heintz, 163 Conn. 23, 27, 301 A.2d 249 (1972). The ultimate test that the trial court must apply to the verdict is whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. Id; Briggs v. Becker, 101 Conn. 62, 124 A. 826 (1924). It is the court's duty to set aside the verdict where it finds that it does manifest injustice and is palpably against the evidence. Malmberg v.Lopez, 208 Conn. 675, 679-80, 546 A.2d 264 (1988). If the amount awarded shocks the sense of justice as to what is reasonable, then the inferred conclusion is that the jury was misguided in reaching its decision. Id.
at 680.
While the Court has broad discretion in determining whether to set aside a verdict, such broad discretion is not unfettered. Suarez v.CT Page 12588Sordo, 43 Conn. App. 756, 759-760, 685 A.2d 1144, cert denied 240 Conn. 906
(1997); Lee v. Lee, 171 Conn. 1, 3, 368 A.2d 11 (1976). In fact, the setting aside of a verdict of a jury raises serious constitutional issues. Jacobs v. Goodspeed, 180 Conn. 415, 416-417 9 A.2d 915, 42
(1980); Suarez, supra, at 759-760. Litigants have a constitutional right to have issues of fact decided by a jury. Connecticut Constitution, Art. I, § 21; see also Ginsberg v. Fusaro, 225 Conn. 420, 425, 623 A.2d 1014
(1993); Suarez, supra, at 760. The right to a jury trial is fundamental in our judicial system, and the Courts have said that: "[t]his right is an obviously immovable limitation on the legal discretion of the court to set aside a verdict." Suarez, supra, at 760. The constitutional right of a trial by jury includes the right to have issues of fact as to which there is room for reasonable difference of opinion among fair-minded men passed upon by the juror and not by the Court. Caciopoli v. Acampora,30 Conn. App. 327, 332, 620 A.2d 191 (1993).
The Court's power to order a remittitur should be exercised "only when it is manifest that the jury have included items of damage which are contrary to law, and not supported by proof, or contrary to the court's explicit and unchallenged instructions," Tomczuk v. Alverez, 184 Conn. 182,188, 439 A.2d 935 (1981); see also Rosenblatt v. Berman, 143 Conn. 31,37-38, 119 A.2d 118 (1955), or when "the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption." Berry, supra, at 810.
The granting of a motion for a new trial likewise rests within the discretion of a trial court. Corbin v. Corbin, 179 Conn. 622, 626,427 A.2d 432 (1980). The basic question that the court must address in considering a motion for a new trial is whether, on all of the evidence, an injustice has been done and whether it is probable that on a new trial a different result would be reached. Ginsburg v. Cadle Co.,61 Conn. App. 388, 392-93, 764 A.2d 210 (2001).
ERI argues that the verdict should be set aside or remitted because, as a matter of law and as a matter of fact, the parties could not have intended for the phrase "lost MOU tax credit" in the default provision to be construed as $95 million. Alternatively, it argues that the court should order a new trial because the mention of $95 million in tax credits prejudicially infected the entire trial and constituted a manifest injustice to ERI.
Motion to Set Aside
"Although ordinarily the question of contract interpretation being a question of the parties' intent, is a question of fact . . . [w]here CT Page 12589 there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) Tallmadge Bros., Inc. v. Iroquois GasTransmission System, L.P., 252 Conn. 479, 495, 746 A.2d 1277 (2000).
 Our interpretation of these contract provisions is guided by well established principles of contract law. A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. (Internal quotation marks omitted.)
Tallmadge Bros. Inc. v. Iroquois Gas Transmission System, L.P., supra, at 498.
The default provision at issue provided as follows:
 In the event some or all of the MOU tax credit becomes unavailable to ERI due primarily to an act or circumstance within ERI's control (for example, our failure to maintain in-state employment at specified levels), then immediately upon the happening of such disqualifying event, ERI will pay Northington 7% of the lost MOU tax credit (s) at (i) the nominal value of such lost MOU tax credit (s), if such event occurs prior to any transfer or realization of value, or (ii) the average historical Realized Value rate, if such event occurs after one or more transfers of MOU tax credit for value have established a realization rate.
The first issue surrounds the meaning of the phrase "MOU tax credit" as used in the foregoing default provision. ERI argues that the phrase cannot mean an amount greater than $15 million because that is the greatest amount of tax credits that the DECD can award in an MOU. CT Page 12590 Furthermore, at the time ERI and Northington signed the Agreement, neither party was aware of the amount of tax credits which Northington would ultimately seek on behalf of ERI. That amount was determined based on ERI growth projections provided to Northington in the months following the signing of the Agreement.
Northington argues that the Agreement does not specifically limit the MOU tax credits to $15 million. Furthermore, in the Agreement Northington undertook to represent ERI in proposals made to the Connecticut Insurance Department, the DECD, the Connecticut Department of Revenue Services, and "such other administrative and/or legislative bodies as may be necessary to determine whether the State would agree to the granting of tax credits . . ." ¶ A. If the parties only intended to seek $15 million in tax credits, there would have been no need for Northington to make proposals to any administrative agencies other than DECD. Moreover, the actual MOU's signed by DECD and DRS did specifically refer to proposed tax credits in the amount of $95 million.
For the foregoing reasons, the court cannot say as a matter of law or fact that the phrase "MOU tax credits" meant no more than $15 million in tax credits. The meaning of the term was certainly not clear based only upon a reading of the Agreement and there was sufficient evidence to support a finding that the the parties did not intend phrase to be so limited.
ERI also argues that the default provision was inapplicable under the circumstances of this case because that provision only applied after the tax credits had been granted to ERI, and then became "unavailable" because ERA did something such as failing to maintain in-state employment at specified levels. The ordinary meaning of the language used in the default provision supports this argument. The language refers to "some or all of the MOU tax credit" becoming "unavailable" due to ERI's conduct such as its failure to maintain employment levels. Tax credits must first exist before they can become unavailable, ERI argues. This argument is further supported by the language in the default provision which refers to the conduct of ERI as a "disqualifying event." ERI would first have had to qualify for tax credits before its conduct could disqualify it from receiving such credits.
There is no dispute between the parties that the signing of the MOU by DECD did not create tax credits in any amount. The MOU signed by DECD contained various prerequisites to the granting of tax credits:
The Tax Credit may be claimed only:
CT Page 12591
1. by a taxpayer who has invested in an Insurance Business through a Qualified Fund (an "Investor") or by a taxpayer who received the Tax Credit via a transfer of the credit from an Investor;
 2. which Fund has a total asset value of not less than $30 million for the Income Year for which the initial credit is taken;
3. which Fund has not fewer than three investors;
 4. where the companies in which the Fund invests are unaffiliated with the investors in the Fund;
 5. if the total investment in any one company does not exceed $15 million unless the Commissioner of DECD, upon evaluating the economic benefits to the state, recommends to the General Assembly an application for an amount of credits that exceeds this limitation.
There was no evidence whatsoever introduced by either party to suggest that the default provision of the Agreement was intended to apply to a default which occurred prior to the time the tax credits had been awarded. Rather, the parties agreed that the default language was suggested by ERI as a means of gaining Northington's agreement to wait until ERI received the benefit of tax credits before Northington received its compensation. In the original draft of the Agreement proposed by Northington, Northington was to receive a fee of 5% of the tax credits allowed under the MOU at the time the MOU's were signed. In exchange for waiting to be paid until ERI received the tax credits, which under the terms of the MOU, and the Act, was a minimum period of four years, Northington increased its fee percentage to 7% and required the default provision at issue to insure that during the four year "waiting" period ERI lived up to the employment levels and other requirements for receiving tax credits.
Under the language of the default provision and the evidence concerning the parties' intent with respect to that provision, the provision only applied after the tax credits mentioned in the MOUs had been awarded. Both parties agree that the prerequisites to the granting of the tax credits never occurred. Therefore, the tax credits never came into existence. ERI's conduct could not render the credits "unavailable" because they were never available in the first instance.
The language of the Agreement simply did not address the issue of CT Page 12592 damages due to Northington in the event that tax credits were never granted, the precise circumstance found in this case. As a matter of law, therefore, ERI's conduct which allegedly prevented the tax credits from coming into existence, cannot be interpreted to constitute a "disqualifying act" which rendered the tax credits "unavailable" without impermissibly torturing those "words to impart ambiguity." See TalmadgeBros., Inc., supra, at 498. Therefore, as a matter of law, the Verdict on the First Count could only be for $50,000 which ERI was to pay Northington upon the signing of the MOU's and the balance of the Verdict cannot stand. Since a portion of the Verdict was proper it cannot be set aside. Therefore, the Motion to Set Aside the Verdict is denied. However, the court grants the Motion for Remittitur on the First Count as to all of the Verdict, except $50,000.
Motion for Remittitur
In the Second Count of the Complaint Northington alleges that ERI's conduct constituted a breach of the covenant of good faith and fair dealing. "The implied covenant of good faith and fair dealing requires faithfulness to an agreed common purpose and consistency with the justified expectation of the other party in the performance of every contract. . . . Essentially, it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." Southbridge Associates, LLC v. Garofalo,53 Conn. App. 11, 16, 728 A.2d 1114, cert. denied, 249 Conn. 919,733 A.2d 229 (1999); Lasalle National Bank v. Freshfield Meadows,69 Conn. App. 824, 834, 796 A.2d 625 (2002). In every contract "there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Williston on Contracts (Fourth Ed. 2000), Vol. 13, § 38:15, p. 437.
There was ample evidence to support Northington's contention that ERI breached the covenant of good faith and fair dealing. Timothy Curry, an attorney employed by ERI, who was involved in much of ERI's dealing with Northington, testified that in March, 1998 or earlier, he had concerns that ERI might not legitimately qualify for the tax credits in question because those credits were intended to go to companies that neededadditional capital to expand their business. ERI was funding its expansion with its own existing capital and did not need additional capital. However, ERI waited until November, 1998, before it sought a legal opinion about the legality of the transaction. ERI did not receive the legal opinion until after the MOU's were already signed. The attorney for the Fleet Bank, which was to be the prime lender of the money ERI had to borrow in order to satisfy the requirements of the Act, was from the CT Page 12593 same law firm as the attorney from whom ERI sought the eleventh hour legal opinion. Within days after ERI's attorney recommended additional disclosures to the DECD and DRS concerning the transaction, the attorney for Fleet made a similar request, and further stated that the bank would not make the loan if the DRS and DECD did not sign an additional document which indicated that those agencies were aware of the very short term nature of ERI's financing.
Northington also introduced evidence that during the later part of 1998 ERI and Chubb, a large insurance company, had begun to discuss a merger. The outstanding indebtedness to Northington for what were then future tax credits might make the merger less attractive to Chubb. Northington argued and the jury could have inferred that ERI's eleventh hour efforts to obtain legal opinions and its ostensible inability to obtain financing without certain conditions were pretextual, with the real purpose being to avoid the obligations of the Agreement with Northington in light of the potential Chubb merger.
Northington's arguments are summarized as follows. Good faith performance or enforcement of a contract requires faithfulness to an agreed upon purpose and consistency with the justified expectations of the other party. Magnan v. Anaconda Indus., Inc., 193 Conn. 558, 566,479 A.2d 781 (1984). Northington had a justified expectation that ERI would not purposely derail the tax credit transaction, but ERI did purposely derail that transaction. But for the bad faith conduct of ERI, the tax credits would have existed, and Northington would have received compensation in accordance with the success fee portion of the Agreement, that is 7% of the amount of the tax credits.
There was evidence to support a finding that the DRS MOU constituted a revenue ruling and the DECD MOU was an agency order upon which the parties were entitled to rely. There was also evidence that all of the concerns which were potential impediments to the transaction were occasioned solely by the conduct of ERI. The failure to secure financing[2], the decision to adopt a revolving loan of a shorter term nature after the MOUs were signed — which would necessarily need to be repaid within a few days because ERI had delayed the financing, and the decision to secure that revolving loan with cash after the MOUs were signed, were acts or circumstances within ERI's control.
Based on the foregoing the jury could have concluded that but for the bad faith conduct of ERI, the $15 million in tax credits would have existed. This would have justified the jury in awarding Northington the $50,000 it was to receive under the Agreement upon the signing of the MOUs, as well as $1,050,000, or 7% of $15 million for a total of CT Page 12594 $1,100,000.
The parties agree that the DECD had authority to award only $15 million in tax credits. In order to obtain additional credits over that amount, the General Assembly had to approve the tax credits. The language of the DECD MOU (Exhibit 29) confirms the speculative nature of such approval:
 Since the signatories to this agreement cannot know how the General Assembly will respond to the recommendation of DECD, this Memorandum of Understanding provides for a minimum of $15 million in credits for 155 new jobs in the state (the "Base Case") prior to December 31, 2001. p. 2.
 If the General Assembly does not agree to provide the company with any credits above the $15 million limit, or does so on terms unacceptable to the Company, then none of the provisions or requirements concerning additional job creation in the immediately preceding paragraph shall apply, and the company shall only be required to create 155 new jobs by the end of the fourth year, and only be required to comply with the provisions of the Act for ten years as set forth therein. p. 3.
"It is axiomatic that a claimant seeking damages bears the burden of proving, with reasonable certainty, those damages sustained as a result of his injury. Fox v. Mason, 189 Conn. 484, 488, 456 A.2d 1196 (1983);Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 410,456 A.2d 325 (1983); Johnson v. Flammia, 169 Conn. 491, 500, 363 A.2d 1048
(1975)." Conaway v. Prestia, 191 Conn. 484, 493-94, 464 A.2d 847 (1983).
Further, a plaintiff must prove the fact of damages and the damages themselves with reasonable certainty. Beverly Hills Concepts, Inc. v.Schatz and Schatz, Ribikoff and Kotkin, 247 Conn. 48, 78, 717 A.2d 724
(1998). While many cases addressing whether a plaintiff proved its damages to a reasonable certainty concern the "mathematical exactitude" of the damages claimed, see, e.g., Falco v. James Peter Assocs., Inc.,165 Conn. 442, 445, 335 A.2d 301 (1973), a plaintiff also fails to carry its burden regarding damages where the evidence does not establish money damages in the first instance with reasonable certainty. Beverly HillsConcepts, Inc., supra, at 78. To satisfy its burden of proving damages to a reasonable certainty, a plaintiff must "remove the question of damages from the realm of speculation." Id.
There is no dispute that under the Act tax credits exceeding $15 million could not be issued absent legislative approval from the Connecticut General Assembly. Here, the General Assembly never even CT Page 12595 considered the issuance of tax credits in excess of $15 million. As a matter of law, the jury could not have predicted, let alone have concluded with reasonable certainty, that the General Assembly, with over 180 members, would have approved such an issuance had the issue ever been considered.
In Steiner v. Beaudry Oil Service, Inc., 545 N.W.2d 39
(Minn.Ct.App. 1996) the plaintiffs claimed damages to their property as a result of an oil leak. Following the oil leak, the plaintiffs applied for reimbursement for their property damages under the Minnesota's Petroleum Tank Release Cleanup Act ("Petrofund"), which required approval from the Petrofund Board. The trial court excluded testimony regarding the plaintiffs' application for Petrofund reimbursement, and the defendant appealed. The Appellate Court held that such evidence was properly excluded as "speculative because the Petrofund Board had not yet made a final determination regarding any reimbursement." Id. at 44.
The jury in this case could not have predicted the General Assembly's possible actions with any greater certainty than the Steiner jury was able to predict the actions of the Minnesota Petrofund Board. Both instances necessitated speculation that cannot support an assessment of damages with reasonable certainty.
In this case it is not only the amount of damages, but also the basis of the damages that is necessarily speculative. That is, Northington's theory of damages — that it should be entitled to recover a percentage of the highest possible amount of tax credits that the General Assembly could have approved if it ever had considered a bill — requires assumptions that are so inherently speculative that they cannot properly form the basis of an award of damages. See, e.g., Westport TaxiService, Inc. v. Westport Transit Dist., 235 Conn. 1, 28, 664 A.2d 719
(1995) (assumptions supporting a damage theory must be "reasonable in light of the record evidence"). The uncertainty of the legislative process is manifest, even under the best of circumstances. This case was not one which involved the best of circumstances due to serious questions as to whether ERI would qualify for the tax credits at all under the Act.
The only evidence concerning possible General Assembly approval introduced at the trial was that Northington's hired lobbyist, Thomas Moukasher, had approached two legislative leaders during 1998, months prior to any possible legislative consideration. Not only was there no evidence as to whether or not the General Assembly would have approved such measure, there was no evidence before the jury as to assembly member leanings. As a result, the jury was left solely with the conclusory CT Page 12596 statements of Northington's lobbyist. The words and actions of Northington's lobbyist, however, did not constitute evidence of what the General Assembly would have done had the issue reached the legislative floor, and did not prove that it was reasonably probable that the General Assembly would have approved $80 million in additional tax credits.
Northington did not call legislators or legislative leaders to testify as to how they would have voted, nor did it call an expert witness to testify as to the likelihood of legislative approval. The only evidence that the plaintiff offered was that Mr. Moukasher spoke with legislative staff in 1998 about the possible introduction of legislation yet to be drafted, into a legislative session yet to be commenced — not that anyone indicated even a possibility of approval.
There was no evidence that the General Assembly would probably have approved additional tax credits, but there was evidence to the contrary. As set forth above, the MOU clearly acknowledged that the parties "cannot know how the General Assembly will respond to the recommendation of DECD." In addition it recognized that the General Assembly could grant tax credits subject to conditions which were unacceptable to ERI:
 If the General Assembly does not agree to provide the company with any credits above the $15 million limit, or does so on terms unacceptable to the Company, then none of the provisions or requirements concerning additional job creation in the immediately preceding paragraph shall apply, and the company shall only be required to create 155 new jobs by the end of the fourth year, and only be required to comply with the provisions of the Act for ten years as set forth therein.
Moreover, Paul Pescatello, the DECD attorney involved in the transaction, testified without contention that upon learning of the short-term financing involved in the proposed transaction, the DECD was not going to recommend to the General Assembly that it approve additional tax credits because the proposed transaction was inconsistent with the spirit of the Act. As set forth above, the purpose of the Act, as stated by Mr. Leonardi in support of the Act's passage, was to attract additional capital for companies who wanted to expand insurance businesses within Connecticut. At the genesis of the transaction with Northington, ERI did not need additional capital for its expansion. Thus, the evidence underscored the speculative nature of the $95 million tax credit.
Based on the foregoing, the jury's award of $5,600,000, or 7% of the $80 million in tax credits which had not been approved by the General CT Page 12597 Assembly, must be remitted, because it was based on impermissible speculation. Therefore, the court orders a remittitur in that amount on the Second Count of the Complaint.
Motion for New Trial
ERI argues that it is entitled to a new trial because of 1) repeated references to $95 million in tax credits, which were prejudicial and 2) because Northington's attorney offered evidence in front of the jury after the court had specifically ruled that such evidence was inadmissible.
While the repeated references to the $95 million in tax credits may have been prejudicial to ERI, the court cannot find that they were impermissibly prejudicial because the $95 million figure was referenced in multiple exhibits (12, 16, 17, 29 and 30) which were admitted into evidence without objection by ERI. The entire transaction between ERI and Northington was premised on securing $95 million in tax credits. Although this court has ultimately ruled that there was insufficient evidence to permit a jury to conclude that the General Assembly would have granted $80 million of the $95 million, that amount was a proper part of the evidence and, therefore, reference to it was not impermissibly prejudicial to ERI.
ERI also argues that the Verdict should be set aside and a new trial granted because during cross-examination of ERI's main witness, Timothy Curry, Northington sought to introduce into evidence a tape recorded phone message purportedly left by Jeffrey Simpson, a banker from Fleet Bank, to which ERI objected. According to Northington's theory of the case as presented to the jury, the message from Mr. Simpson disclosed the "real" reason that the transaction would not go forward, that ERI and Fleet Bank could not agree to material banking terms. After a lengthy argument outside of the jury's presence, the court excluded Northington's proffered evidence of Simpson's phone message. The court ruled that a transcript of the tape could be shown to Curry, to refresh his recollection, but could not be shown to the jury. Immediately upon the jury's return, Northington's counsel asked Curry if his recollection was refreshed, and then asked to play the recording to the jury. I In light of the court's ruling this question was improper and not inadvertent.
ERI argues that it was forced to object, with the necessary implication that it was trying to keep information from the jury. The court sustained the objection. Northington's counsel asked various other questions about the tape recording to which there were no objections. He also asked the court whether he could show the jury the typed transcript of the tape CT Page 12598 recording. ERI again objected and the court sustained the objection. The court believes that the conduct of Northington's counsel was improper and was done in deliberate disregard of the court's ruling.
ERI claims that at this point it had been severely and irreversibly prejudiced because the primary theme of Northington's case was that ERI acted dishonestly and deceptively by concealing material information, i.e., the Chubb merger, from Northington. ERI argues that plaintiff's counsel's repeated references in front of the jury to the inadmissible evidence improperly served to reinforce these themes of deception and concealment by ERI.
Under Connecticut law, a new trial is mandated where counsel's remarks prejudice the ability of a party to obtain a fair trial. Murray v.Taylor, 65 Conn. App. 300, 306, 782 A.2d 702 (2001). Similarly, a trial judge should set aside a jury verdict where opposing counsel's conduct causes manifest injury to a litigant. Yeske v. Old Farms School, Inc.,1 Conn. App. 195, 205, 470 A.2d 405 (1984). The Court in Yeske stated:
 The trial judge is in the best position to determine whether the admonition given was a sufficient antidote for improper argument. Note, 10 A.L.R.3d 1330, 7 and 8. If a counsel's remarks so prejudice the ability of a party to obtain a fair trial, a new trial is mandated. Edwards v. Sears, Roebuck Co., 512 F.2d 276, 286 (5th Cir. 1975). There are occasions when there is no possibility that any instruction will be curative; see State v. Ubaldi, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 462 U.S. 1001, 104 S.Ct. 280, 78 L.Ed.2d 259 (1983); and in such exceptional cases, the verdict should be set aside and a new trial ordered, regardless of whether the opposing party took exception to the remarks. Hennessy v. Metropolitan Life Ins. Co., 74 Conn. 699, 710, 52 A. 490 (1902).
A verdict should be set aside if there has been manifest injury to a litigant, and it is singularly the trial court's function to assess when such injury has been done since it is only that court which can appraise the atmosphere prevailing in the courtroom. Pisel v. Stamford Hospital, 180 Conn. 314, 322, 430 A.2d 1 (1980); Cavallaro v. Offen, 29 Conn. Sup. 20, 21, 269 A.2d 83 (1969). The trial judge has discretion as to the latitude of the statements of counsel made during argument. Practice Book 296. The court here acted properly in setting aside the verdict because of the statements of the plaintiffs' attorney. CT Page 12599
1 Conn. App. at 204-205.
Northington argues the only two questions that are in issue, for which the jury did not hear the answer, were: What was Curry's recollection of the conversation after it had been refreshed, and what is it that Mr. Simpson said to him. It further argues that those two questions must be seen in context of the four-day trial with ten witnesses and 97 exhibits.
The court agrees with Northington. Although its counsel's conduct was improper, the court cannot say that such conduct was impermissibly prejudicial to ERI in light of the other evidence before the jury on this issue and others. The jury knew about the taped message because Mr. Curry admitted it. The jury knew Mr. Curry remembered it once his recollection was refreshed. The jury knew that the court considered the testimony to be hearsay. Before and after evidence the court instructed the jury on the fact that it would be making evidentiary rulings and that the jury should consider only admissible evidence. The court specifically charged the jury that:
 There are a number of things that may have been seen or heard during the trial which are not evidence and which you cannot rely on as evidence in deciding whether a party has proven a claim. For example,
 the statements made by lawyers, including statements made both in their opening statements and in their closing arguments are not evidence.
 a question is not evidence: it is the answer, not the question or the assumption made in the question, that is evidence.
testimony or exhibits that were offered but refused.
testimony that was ordered to be stricken.
 exhibits marked for identification that were not received in evidence as full
exhibits are not evidence.
(Jury Charge at 3.) CT Page 12600
The trial process is not perfect. Shaywitz v. Singing Oaks Day Camp,8 Conn. App. 71, 76, 510 A.2d 1013 (1986). Therefore, the burden when seeking a new trial is steep. A party must show manifest injustice and an inability for a litigant to obtain a fair trial. Krooner v. State,137 Conn. 58, 60, 75 A.2d 51 (1950).
This case is entirely different than State v. Ubaldi, 190 Conn. 559,462 A.2d 1001 (1983), relied upon by ERI. In Ubaldi the State sought to introduce the testimony of a witness who claimed the Fifth Amendment right to refrain from testifying. The court ruled that the State could not call the witness. In closing arguments, the prosecutor urged the jury to draw an unfavorable inference from the defendant's failure to call that witness. The guilty verdict was set aside because the Court held that the appropriate remedy for an unfair trial due to prosecutorial misconduct is to vacate the judgment of conviction and to grant a new trial.
In many cases in which the alleged prejudice to the litigant is more egregious than in the present case, courts have refused to order a new trial. See Rizzo Pool Co. v. Del Grosso, 232 Conn. 666, 687, 657 A.2d 1087
(1995) (denying motion for new trial where counsel made remarks such as "I have over thirty years heard many arguments . . . . I've never heard one which is a combination of such sleaze, slime and innuendo as the one that I just was unfortunately victimized into listening to."); Murray v.Taylor, 65 Conn. App. 300, 314-315, 782 A.2d 702 (2001) (denying new trial despite comments that defendant was a liar and that plaintiff was good and truthful, coupled with references to inadmissible testimony which the court instructed the jury not to consider); Pitter v. Grippo,177 Conn. 398, 399, 418 A.2d 60 (1979) (refusing to set aside verdict despite reference to insurance in the testimony of the plaintiff).
The court does not find that this is an exceptional case such as Yeskev. Old Farms School, Inc., supra, (plaintiff's counsel made comments about the defendants' counsel's appearance, the size of his firm, and likened the defendants' counsel to a corrupt attorney played by Edward G. Robinson in a movie) where the prejudice to ERI warrants a new trial. Therefore, the Motion for a New Trial is denied.
Motion for Punitive Damages and Interest
Northington has moved the court to award it punitive damages in the amount of $4,000,000 and attorneys' fees in the minimum amount of $447,696.60 and costs in the amount of $23,804.74 pursuant to Connecticut General Statutes § 42-110g of the Connecticut Unfair Trade Practice Act. The standard for the type of conduct which justifies awarding CT Page 12601 punitive damages under CUTPA was established in Gargano v. Heyman,203 Conn. 616, 622, 525 A.2d 1343 (1987):
 "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. Collens v. New Canaan Water Co., 155 Conn. 477, 489, 234 A.2d 825 (1967). In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence. Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 128, 222 A.2d 220 (1966)." Venturi v. Savitt, Inc., 191 Conn. 588, 592, 468 A.2d 933 (1983).
In United Technologies Corporation v. American Home Assurances Co.,118 F. Sup.2d 174 (2000), the court adopted the following factors used in BMW v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), in its determination that a CUTPA punitive damages award of $16 million dollars provided the desired deterrent effect: 1) the degree of reprehensibility of the defendant's conduct; 2) the disparity between the harm or potential harm suffered by plaintiff and the punitive damages awarded; 3) the difference between punitive damages awarded and civil penalties authorized by law or imposed in comparable cases; and, 4) the fact that the award represented one-half of one percent of defendant's net worth, a percentage range in which the Second Circuit has approved punitive damages awards.
The court does not find that ERI's conduct was reprehensible or malicious. Although ERI's concerns about the legality of the tax credit plan proposed by Northington could certainly have been raised at an earlier time, the concerns were valid. Northington had obtained the MOU's from the DECD and DRS without disclosing that the "investment" required under the Act to obtain tax credits would be a short term loan which would be repaid in a matter of days or weeks. ERI should not be sanctioned with punitive damages for its hesitation in going through with a transaction which, at best, played fast and loose with the requirements of the Act.
Several factors set forth in the United Technologies case require the court to assess punitive damages in light of the harm suffered by the plaintiff and the damages awarded. Although Northington has made repeated references to the work it did with respect to the tax credit transaction, it introduced no evidence about the specific amount of time it devoted to the transaction. There was evidence that a person or persons from Northington worked on the transaction for the better part of CT Page 12602 a year. but there was no evidence that that person worked on nothing else during that time. Even if Northington personnel worked a total of forty hours per week for one year and were compensated at the rate of $300 per hour for their work, the total amount of Northington's loss would have been only approximately $600,000. Under the ruling herein, if Northington accepts the verdict as remitted, it will still have damages in the amount of $1,100,000
In Connecticut the moving party must prevail on the CUTPA cause of action before attorneys' fees can be awarded. Vezina v. Nautilus Pools,Inc. 27 Conn App. 810, 821, 610 A.2d 1312 (1992) (citing Connelly vHousing Authority, 213 Conn. 354, 360, 567 A.2d 1212 (1990)). Here Mr. Leonardi testified in front of the jury that Northington was merely seeking nominal damages in the amount of one dollar on the Third Count of the Complaint. The jury awarded one dollar nominal damages, and did not award any actual damages.
Under CUTPA, the allowance of an award of attorneys' fees is to further the policy of encouraging "private attorney generals" to bring lawsuits to vindicate important rights. Gill v. Petrazzuoli Bros., Inc.,10 Conn. App. 22, 521 A.2d 212, 218 (1987). The ability to recover attorneys' fees serves to encourage private CUTPA litigation. Hinchclffev. America Motors Corp., 184 Conn. 607, 617-18, 440 A.2d 810 (1981). It is this concept of "private attorney general" that forms the basis of numerous federal statutory awards for attorneys' fees. See Buckhannon v.W. Va. Dep't of Health Human Resources, 532 U.S. 598.112 S.Ct. 1835 (2001); Rotella v Wood, 528 U.S. 549, 120 S.Ct. 1075 (2000).
A CUTPA claim should not be alleged as a vehicle to obtain attorneys' fees. Economic Development Associates v. Cititrust,3 Conn.L.Rptr. 403, 406 (March 27, 1991, Dranginis, J.). Courts can award attorneys' fees under CUTPA only for those expenses that were related to the prosecution of CUTPA claim. Jacques All Trades Corp. v. Brown,57 Conn. App. 189, 200, 752 A.2d 1098 (2000). See also Hensley v.Eckerhart, 461 U.S. 424, 440, 13 5. Ct 1933 (1983).
Since Northington sought only one dollar in damages, Northington used the CUTPA count as a vehicle to obtain attorneys fees in a breach of contract action where the contract had no provision for such fees. Arguably, CUTPA does not apply in this case, both because it is merely a breach of contract action, see i.e., Petco Insulation Co. v. StackContracting Services, Inc., 10 Conn.L.Rptr. 626 (Super.Ct. Feb. 28, 1994) and because entering into agreements for tax credits was not within the "usual trade or business of ERI." See, i.e, .Arawana Mills Co. v.United Technologies Corp., 795 F. Sup. 1238, 1252-53 (D.Conn. 1992). CT Page 12603 However, ERI has not raised the issue of the applicability of CUTPA and the jury has found a CUTPA violation.
Based on a review of the billing records submitted by Northington's counsel it appears that no more than one tenth of the total fees and costs were devoted to the CUTPA claim. Therefore, the court awards the plaintiff attorneys' fees under CUTPA in the amount of $47,150.
Interest Under § 37-3a
Northington is seeking interest pursuant to Connecticut General Statutes § 37-3a on the jury award in its favor in the amount of $6,700,000.00. More specifically. Northington argues that it is entitled to interest at the rate of 10% per year on: 1) the amount of $50,000.00 from November 28, 1998, ten days after the parties executed the MOU with the DRS. thus triggering the remainder of Northington's retainer, and 2) the amount of $6,650,000.00 from December 23, 1998 when ERI iweached the parties' Agreement and wrongfully detained money belonging to the Northington.
Connecticut General Statutes § 37-3a provides:
 Except as provided in sections . . . 52-192a, interest at the rate often per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable.
The determination of interest under § 37-3a is a matter that is within the discretion of the court. West Haven Sound Development Corp.v. West Haven, 207 Conn. 308, 322-323, 541 A.2d 858 (1988); Patron vs.Konover, 35 Conn. App. 504, 517, 646 A.2d 901 (1994). In making this determination, the court must decide "whether the detention of the money is or is not wrongful under the circumstances." Patron v. Konover, supra, at 517. In determining whether a detention is wrongful, the basic question is whether "the interests of justice require the allowance of interest as damages for the loss of use of money." Harris Calorific SalesCo., 18 Conn. App. 559, 566, 559 A.2d 241 (1989).
The court finds that the detention of the $50,000 due upon the signing of the MOU's was wrongful, and, therefore, awards interest on that amount at the rate of 10% per annum from November 28, 1998 in the amount of $19,247.
As explained above, ERI was not in violation of the default provision of the Agreement, and, therefore, no additional amount has ever been due CT Page 12604 to Northington under that provision. There was a significant dispute as to whether ERI's conduct violated the covenant of good faith and fair dealing. This dispute was not resolved until the jury rendered its verdict. Therefore, the failure to pay the portion of the verdict which remains after acceptance of the remittitur, if such acceptance occurs, was not wrongful and the plaintiff is not entitled to interest under § 37-3a on such amount.
Interest Under § 52-192a
Connecticut General Statutes § 52-192a provides:
(a) After commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may before trial file with the clerk of the court a written "offer of judgment" signed by him or his attorney, directed to the defendant or his attorney, offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. . . .
(b) After trial the court shall examine the record to determine whether the plaintiff made an "offer of judgment" which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his "offer of judgment", the court shall add to the amount so recovered twelve per cent annual interest on said amount . . . . In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the "offer of judgment" was filed not later than eighteen months from the filing of such complaint. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly . . . .
The Complaint in this case is dated July 9, 1999, and was filed on July 13, 1999. On October 31, 2000, the plaintiff served an offer of judgment on the defendant in the sum of $1 million. Since the amount of the verdict, even as remitted by the court, is greater than $1 million, if Northington accepts the remittitur, it is entitled to recover interest at the rate of 12% on the amount of $1,100,000 from July 13, 1999. The court awards Northington interest in the amount of $428,547 and an attorneys fee of $350 pursuant to § 52-192a. CT Page 12605
Under Connecticut General Statutes § 52-228b no verdict "may be set aside solely on the ground that the damages are excessive unless the prevailing party has been given an opportunity to have the amount of the judgment decreased by so much thereof as the court deems excessive." Therefore, it is hereby ORDERED:
That unless Northington accepts the verdict as remitted by this court, that is. reduced from $6.7 million to $1.1 million, within 20 days of the date this decision is filed, then the verdict will be set aside and the attorneys fees, $47,150, and $350, and interest, $19,247 and $428,547, awarded herein will be null and void.
By the court,
_____________________ Aurigemma, J.